INDIANA TELEPHONE ASSOCIATION,
INC., Appellant (Intervenor Below),

v.

PUBLIC SERVICE COMMISSION of
the State of Indiana, Appellee
(Tribunal Below),

and

MCI Telecommunications Corporation, GTE Sprint Communications Corporation, Communications Corporation of Indiana, Inc., Home Telephone Company, Inc., (Waldron), Home Telephone Company of Pittsboro, Inc., Elnora Telephone Company, Inc., Mid-Indiana Communications Corporation, General Telephone Company of Indiana, Inc., Bloomingdale Home Telephone Company, Inc., Camden Telephone Company, Inc., Central Indiana Telephone Company, Inc., Cincinnati Bell, Inc., Citizens Telephone Company, Inc., Citizens Telephone Corp., Liberty Center Telephone Corp., Clay County Rural Telephone Co-Op, Inc., Continental Telephone System of Indiana, Inc., Continental Telephone Company of Indiana, Craigville Telephone Company, Inc., Daviess-Martin Company Rural Telephone Corp., Elberfeld Telephone Company, Inc., Garrett Telephone Company, Inc., Gettingsville Telephone Company, Hancock Rural Telephone Corporation, Communications Corporation of Indiana, Indiana Bell Telephone Company, Inc., Ligonier Telephone Company, Inc., Merchants & Farmers Telephone Company, Mid-American Communications Corp., Mid-Indiana Telephone Corp., Monon Telephone Company, Monrovia Telephone Corporation, Mulberry Cooperative Telephone Company, Inc., New Lisbon Telephone Company, New Paris Telephone Company, Inc., Northwestern Indiana Telephone Company, Inc., Odon & Madison Twp. Telephone Company, Inc., Perry-Spencer Rural Telephone Coop, Inc., Poseyville Telephone Company, Inc., Princeton Telephone Company, Pulaski-White Rural Coop, Inc., Rochester Telephone Company, S & W Telephone Company,

Inc., Smithville Telephone Company, Inc., Southeastern Indiana Rural Telephone Coop., Sunman Telephone Company, Swayzee Telephone Company, Inc., Sweetzer Telephone Company, Inc., Thorntown Telephone Company, Inc., Tipton Telephone Company, Inc., Tri-County Telephone Company, Inc., United Telephone Company of Indiana, Inc., Wadesville Telephone Company, Inc., Washington County Rural Telephone Coop, West Point Telephone Company, Inc., and Yeoman Telephone Company, Appellees (Respondents Below).

No. 2–983A324.

Court of Appeals of Indiana,
Second District.

May 13, 1985.

Jerry P. Belknap, Richard E. Deer, Ronald E. Christian, Indianapolis, for appellant Indiana Telephone Ass'n, Inc.

Linley E. Pearson, Atty. Gen., Robert K. Johnson, Deputy Atty. Gen., Indianapolis, for appellee, Public Service Com'n.

Birch Bayh, Daniel Evans, Jr., James T. Smith, David M. Brooks, Indianapolis, for appellee MCI Telecommunications Corp.

Michael J. Huston, Fred E. Schlegel and Mary M. Stanley, Indianapolis, Robert L. Sills, New York City, for appellee GTE Sprint Communications Corp.

Robert L. Dalmbert, Columbus, for appellee Mid-American Communications Corp.

Don S. Holdridge, Fort Wayne, for appellee Gen. Telephone Co. of Indiana, Inc.

John C. Carvey, Indianapolis, for appellees Communications Corp. of Indiana, Inc., Home Telephone Co., Inc. (Waldron), Home Telephone Co. of Pittsboro, Inc., Elnora Telephone Co., Inc., Tri-County Telephone Co., Inc.

Richard L. Besore, Indianapolis, for appellee Indiana Bell Telephone Co.

SHIELDS, Judge.

Indiana Telephone Association (ITA) challenges a decision of the Public Service Commission (Commission) granting certificates of territorial authority (CTA) to provide intercity telecommunications services within Indiana to MCI Telecommunications Corporation (MCI) and GTE Sprint Communications Corporation (GTE). The issue presented for our consideration is whether the Commission has authority to grant to foreign corporations CTAs for telephone services.

On June 27, 1983, MCI filed its petition pursuant to Ind.Code Ann. § 8–1–2–88(b) (Burns 1982) for a CTA to provide intercity telecommunications services within Indiana (Cause No. 37240). MCI, a Delaware corporation, is a long distance telecommunications carrier, authorized by the Federal Communication Commission to construct and operate interstate telecommunication services. On July 15, 1983, GTE, a Delaware corporation, based in Connecticut, petitioned for similar authority (Cause No. 37250). Both MCI and GTE have qualified to do business in Indiana under the General Corporations Act, Ind.Code Ann. § 23–1–11–2 (Burns 1984). The petitions of MCI and GTE were consolidated for purposes of hearing.

Prior to the Commission's hearing on these petitions, ITA, an Indiana not-for-profit corporation, was granted leave to intervene. ITA filed a motion to dismiss the MCI and GTE petitions alleging each petitioner is a foreign corporation and pursuant to Ind.Code Ann. § 8–1–2–91 (Burns 1982) (a section of the 1913 Public Service Commission Act) the Commission is prohibited from granting the requested certificates to foreign corporations. An administrative law judge of the Commission denied ITA's motion; ITA then appealed this denial to the full Commission, which sustained the administrative law judge's ruling on ITA's motion to dismiss. This ruling was the basis for ITA's initial appeal to this court, Cause No. 2–983 A 324, filed September 13, 1983.

While that appeal was pending, evidentiary hearings on the petitions were held before the Commission in October and November, 1983. After these hearings the Commission granted to MCI and GTE certificates of territorial authority to offer and furnish intercity telecommunications services in Indiana. The Commission's order states:

"IT IS THEREFORE ORDERED BY THE PUBLIC SERVICE COMMISSION OF INDIANA that:

1. MCI Telecommunications Corporation and GTE Sprint Communications Corporation, Petitioners herein, each be issued a Certificate of Territorial Authority, evidenced solely by this Order, to offer and furnish inter-LATA telecommunications services in Indiana.

2. Prior to offering the inter-LATA telecommunications services, the Petitioners shall file rates and charges and rules and regulations for service with the Engineering Department of this Commission, which rates, charges and rules and regulations must be approved by the Engineering Department before the Petitioners may offer and provide the inter-LATA telecommunications service approved herein.

3. A condition of the Certificate of Territorial Authority issued in this case is that the Petitioners commence inter-LATA telecommunications service pursuant to the authority granted herein within 18 months after the issuance of this Order. The Petitioners shall file a notice with the Secretary of the Commission of their "in-service" date. If the "in-service" does not fall within the allowed 18 months, the Petitioners shall provide the Secretary of this Commission a written explanation of why the service has not been established, and may be required to appear before the Commission to show cause why the certificate herein granted should not lapse for non-use.

4. This Order shall be effective on and after the date of its approval."

Record at 32–33.

Thereafter, ITA filed its second appeal in this court, Cause No. 2–384 A 74, challenging the Commission's authority to grant said petitions for the same reason stated in ITA's motion to dismiss, that Ind.Code § 8–1–2–91 prohibits the Commission from granting CTAs to foreign corporations. This court granted a request by ITA to consolidate these two appeals under Ind. Rules of Procedure, Appellate Rule 5(B), having found the existence of a common question of law in both appeals. The appeals were consolidated under Cause No. 2–983 A 324.

MCI and GTE also filed petitions for rehearing of the Commission's orders. Both petitions were denied by the Commission. Following the Commission's affirmance of its earlier decisions granting the certificates, ITA filed a third appeal repeating its assertion the Commission acted contrary to law by exceeding its authority. ITA petitioned for a consolidation of this third appeal with the first and second appeals. Consolidation was granted.

Thus, three appeals are before this court: 1) an appeal challenging the Commission's affirmance of the administrative law judge's ruling that denied ITA's motion to dismiss, 2) an appeal challenging the Commission's order granting CTAs to MCI and GTE, and 3) an appeal challenging the Commission's denial of rehearings on its grant of the CTAs. For purposes of this opinion, we address the single issue raised in all three appeals within the framework of the second appeal, i.e., whether the Commission has the authority to grant CTAs to MCI and GTE. That decision necessarily resolves the challenges involved in the other two appeals.

█ ITA argues the Commission's orders exceed its authority because MCI and GTE are not corporations "duly organized" under the laws of Indiana. For this proposition, ITA cites Ind.Code § 8–1–2–91 (Burns 1982) which provides: "No *license, permit* or *franchise* to own, operate,

manage or control any plant or equipment of any public utility shall be hereafter granted or transferred except to a corporation duly organized under the laws of the State of Indiana or to a citizen of such state." (Emphasis added). ITA suggests the phrase "duly organized" in this statute includes only those corporations created or incorporated under the laws of the State of Indiana, and further contends those foreign corporations duly admitted to do business in this state pursuant to the General Corporation Act, Ind.Code § 23–1–11–1 *et seq.*, do not, by virtue of their admission, become "duly organized" for purposes of § 8–1–2–91.

In response, GTE contends the prohibition contained in § 91 is not applicable to a grant by the Commission of a CTA for telephone service under § 8–1–2–88(b). It argues a careful reading of § 91 in the context of the entire 1913 Act discloses that the prohibition pertains only to the grant of a license, permit, or franchise by a municipality.[1] We agree with GTE to the extent it asserts § 91 is inapplicable to the grant of CTAs under § 88.

Since 1951 telephone companies obtain their operating authority under a distinct procedure prescribed by a 1951 amendment to the Public Service Commission Act, Ind. Code Ann. § 8–1–2–88 (Burns 1982) (Acts 1951, ch. 158, § 1).[2]

---

**1.** Several other alternative arguments in support of the Commission's action were advanced by the appellees in their briefs. For example, the Commission and MCI argue a foreign corporation's admission to do business in this state under the General Corporations Act renders such corporation "duly organized" for purposes of § 8–1–2–91. In the alternative, GTE argues 1) the subsequent enactment of the General Corporations Act and § 8–1–2–88 implicitly repeals § 91, and 2) that § 91, if interpreted as suggested by ITA, would be subject to constitutional challenge under the United States and Indiana Constitutions. It also presents a cogent argument based upon *Gradison v. Ohio Oil Co.,* 239 Ind. 218, 156 N.E.2d 80 (1959). In that case our supreme court held that a foreign corporation qualified to do business in Indiana was entitled to exercise the power of eminent domain under a statute granting that power to domestic corporations because the General Corporations Act of 1929 provided that such corporations should

have the same rights and privileges in Indiana as domestic corporations of like character.

**2.** In reaching our conclusion § 91 does not qualify the Commission's authority to issue a CTA under § 88(b), we consider § 91 in the context of the entire 1913 Public Service Commission Act and in light of the law existing before the passage of the Act. *See Froberg v. Northern Indiana Construction, Inc.,* 416 N.E.2d 451 (Ind. App.1981). Consideration of these factors is especially important to properly interpret a statute which was enacted as part of a comprehensive statutory package drafted to respond to a situation then existing.

Ind.Code § 8–1–2–91 was enacted as part of the Public Service Commission Act of 1913, which marked a departure in the handling of public utilities. Prior to 1913, the municipalities of the state were empowered to grant a corporation the right to perform public service

The Public Service Commission is the administrative body empowered by the legislature to issue certificates of territorial authority to telephone companies pursuant to § 8–1–2–88(b).

§ 8–1–2–88(b), in relevant part, provides:

"The commission shall have the power by order to require telephone companies to report, ... the territorial area or areas and the boundaries thereof within the state in which each such company now renders, is reasonably prepared to render, and proposes to render telephone service within a reasonable time. *The commission shall have the power to issue to each such company for any territorial area or areas so reported and not covered by a municipal franchise or any indeterminate permit, a certificate of territorial authority.* The certificate shall determine and define the area or areas in which each such company shall thereafter render telephone service. In cases of conflict involving two (2) or more telephone companies the commission, considering such reports separately, or by consolidation of two (2) or more or all, shall have the power to issue utility, or by the people against the utility, and, in so far as possible, to fix a uniform procedure throughout the state for all concerned."

*State, ex rel. Indianapolis Traction and Terminal Company v. Lewis,* 187 Ind. 564, 569–70, 120 N.E. 129 (1918).

The Act also established a procedure whereby a public utility operating under a municipal franchise contract could surrender such contract and accept in lieu thereof an "indeterminate permit." *See* 1913 Ind.Acts p. 167 § 101. An indeterminate permit is defined under the Act as:

"every grant, directly or indirectly, from the state to any corporation, ... of power, right or privilege to own, operate, manage, or control any plant or equipment, ... within this state, for the furnishing of facilities for the transmission of intelligence by electricity between points within this state, which shall continue in force until such time as the municipality shall exercise its option to purchase, as provided in this act, or until it shall be otherwise terminated according to law."

Ind.Code Ann. § 8–1–2–1 (Burns Supp.1984). By surrendering its franchise contract with the municipality and accepting an indeterminate permit, the utility entered a contract with the state whereby all the terms, conditions, and provisions of the existing franchise agreement were rescinded and abrogated. *City of Huntington,* 211 Ind. 502, 6 N.E.2d 335. The Act further provided that "[e]very license, permit or franchise hereafter granted to any public utility shall have the effect of an indeterminate permit subject to the provision of this act," § 100 of Acts 1913. Thus, it was the Legislature's intent to ensure that all public utilities would eventually operate under indeterminate permits, either directly, by means of the surrender provision in § 101, or indirectly, by operation of law, pursuant to § 100. As indeterminate permit holders, the utility companies were subject to the provisions of the Act and the jurisdiction of the Public Service Commission.

---

for the benefit of the municipality and its inhabitants and to occupy the public streets with instrumentalities employed for such purposes. The power to grant such "franchise" rights was delegated by the general assembly, the body originally entrusted with that power. *City of Huntington v. Northern Indiana Power Company,* 211 Ind. 502, 6 N.E.2d 335 (1937). For example, in 1905 the Legislature enacted the following statutes:

"Any city or town may enter into contract with any person, corporation or association to furnish such city or town and its inhabitants with water, motive power, heat or light, ... or to build ... telegraph or telephone lines ... into or through such city or town; and may provide in such contract the terms and conditions on which such ... telegraph or telephone services ... may be furnished ... to such city or town and to its inhabitants: ..."

1905 Ind.Acts p. 219 § 254.

"The board of public works shall have power: ... Eleventh: To authorize telegraph, telephone, ... companies to use any street, alley or public place in such city, and erect necessary structures therein; to prescribe the terms and conditions of such use and to fix by contract the prices to be charged to patrons."

1905 Ind.Acts p. 219 § 93. During this "home rule" period, "the regulation of local utilities was confined to restrictions embodied in franchises granted by local municipalities or in contracts executed by local municipalities with local utility companies, but under authority granted by the General Assembly." *Williams v. Citizens Gas Company,* 206 Ind. 448, 456, 188 N.E. 212 (1933).

In 1913, the Legislature deemed it wise to establish a more uniform system for the regulation of public utilities and created a state administrative body, the Public Service Commission of Indiana, conferring upon it the powers and duties previously enjoyed by the municipalities.

"The purpose of this law was, in part, to correct through an unprejudiced tribunal certain unfair action against the people by the

its certificate after notice of hearing and a hearing.

After the issuance of such certificate no other telephone company shall render telephone service in the area or areas so determined and defined, except pursuant to a certificate granted by the commission, after notice of hearing and hearing, that public convenience and necessity require that telephone service in any such area be rendered or offered by another company. Any telephone company, without a prior order by the commission, may voluntarily file with the commission a report of the territorial area or areas and the boundaries thereof within the state in which it renders, is reasonably prepared to render, and proposes to render telephone service within a reasonable time. Upon the filing of such voluntary report the commission shall have the power to issue its certificate of territorial authority to such company in like manner and with like effect as if such report had been required by order of the commission as hereinabove provided for in this section." (Emphasis added.)

The supreme court in *General Telephone Company v. Public Service Commission*, 238 Ind. 646, 150 N.E.2d 891 (1958), recognized that by virtue of the 1951 amendment to the 1913 Act, the General Assembly delegated to the Commission the function of allocation of telephone utility service areas. Pursuant to § 88, the Commission was endowed with the authority 1) to require telephone companies to report the territorial area in which each company presently rendered, was reasonably prepared to render, and proposed to render telephone service, and 2) to issue to each company for the area reported and *not covered by a municipal franchise or indeterminate permit* a certificate of territorial authority. The CTA then defined and determined the area in which the company would thereafter render service. By specifically excepting territorial areas covered by either a municipal franchise or indeterminate permit, the drafters of the amendment implicitly recognized 1) that telephone companies were servicing sectors of the public by the authority of a municipally-granted franchise or an indeterminate permit from the Commission, and 2) that a certificate of territorial authority issued by the Commission pursuant to the amendment is neither a municipal franchise nor an indeterminate permit. This latter proposition was emphasized by the supreme court in *General Telephone Company* when it noted "section 54–601(b) [I.C. § 8–1–2–88] clearly distinguishes between a territorial certificate issued pursuant to the Act, and a municipal franchise *or any indeterminate permit.*" (Footnote omitted) 238 Ind. at 655, 150 N.E.2d 891.[3]

Again, we consider the language employed in the prohibitive provision § 91: "No *license, permit,* or *franchise....*" This combination of words, and in all but one instance, the sequence in which the words are arranged, appear repeatedly throughout the 1913 Act. As employed in the various sections, this phrase refers to an existing, or "hereinafter granted" license, permit, or franchise issued by a municipality. For example, § 97 of the Act which pertains to the issuance of a "license, permit or franchise" to a second public utility states:

"Any existing permit, license or franchise which shall contain any term whatsoever interfering with the existence of a second public utility is hereby declared to be against public policy and is hereby amended in such manner as to permit a *municipality to grant a license, franchise or permit* for the operation of such second public utility pursuant to the provisions of this act." (Emphasis added.)

---

**3.** Ind.Code Ann. § 8–1–2–89 provides for the issuance of a CTA to rural sewage disposal companies. Under subsection (a)(4) of that statute, a "certificate of territorial authority" is defined as a "certificate of convenience and necessity issued by the commission pursuant to the provisions of this section, *which said certificate shall be deemed an indeterminate permit,* unless expressly conditioned otherwise by the commission when issued." Thus, where the Legislature intends for CTAs to be treated as indeterminate permits, it has expressly so stated.

This conclusion is buttressed by the language in § 101 which addresses the surrender of an existing license, permit or franchise: "Any public utility operating under an existing license, permit or franchise shall upon filing at any time prior to the expiration of such license permit or franchise ... with *the clerk of the municipality which granted such franchise* and with the commission, a written declaration, legally executed, that it surrenders such *license, permit* or *franchise*, receive by operation of law, in lieu thereof an indeterminate permit...." (Emphasis added.)

■ The words, "license, permit or franchise" in § 91 must be similarly construed to mean licenses, permits or franchises granted by a municipality. Where words are used in one place in the Act, they will be construed as used in the same sense at other places in the Act, unless the clear context of the statute requires a different meaning. *See State v. Cleland*, 471 N.E.2d 722, 725 (Ind.App.1984). Thus, we hold § 91 does not limit the Commission's authority to issue CTAs under § 88 to corporations "duly organized" under the laws of this state.

■ Turning then, to § 88, a reading of that section reveals it does not contain any limitation on the issuance of a CTA to corporations organized under Indiana law. Rather, as used in § 88, the term "telephone company" means *"any ... corporation ... owning, leasing or operating any* lines, facilities or systems, used in the furnishing of telephone service within this state." (Emphasis added.)

Therefore, we conclude the Commission did not exceed its authority in issuing to the petitioners CTAs to offer and furnish telephone services within Indiana.[4]

Orders affirmed.

MILLER, J., sitting by designation, concurs.

SULLIVAN, J., concurs.

---

**4.** We are unpersuaded that our decision sustaining the Commission's grant of CTAs to MCI and GTE will ultimately "erode the Commission's jurisdiction over the rendition of intrastate utility services within Indiana and, consequently impair the interests of the State, its citizens and public utilities duly organized under its laws." Appellant's Brief at 22.

Any foreign corporation which seeks to do business within this state is required to procure a certificate of admission from the secretary of state pursuant to the General Corporations Act, Ind.Code Ann., § 23–1–11–1 et seq. (Burns 1984), prior to receiving a CTA to render telephone service within a territorial area. The foreign corporation seeking admission must provide the secretary of state with an affidavit setting forth the location of its principal office in the state and the name of its designated agent who shall receive service of process in the corporation's name. Ind.Code § 23–1–11–6 (Burns 1984). Moreover, Ind.Code § 23–1–11–2 (Burns 1984) provides "[a] foreign corporation admitted to do business in this state shall ... be subject to the same liabilities, restrictions, duties and penalties ... imposed upon domestic corporations of like character, and to the same extent as if it had been organized under this act to transact the business for which its certificate of admission is issued." This section incorporates all the rules and regulations prescribed by the Commission with which any corporation engaged in a public utility business must comply. Accordingly, we agree with the Commission's assertion that the grant of a CTA to a foreign corporation duly admitted to do business in this State will "not alter [the Commission's] basic role in regulating utility operations." Commission's Brief at 10.