**HARLAN SPRAGUE DAWLEY, INC., Petitioner,**

**v.**

**INDIANA DEPARTMENT OF STATE REVENUE, and John R. Gildea, Commissioner, Respondents.**

No. 49T05–9007–TA–00038.

Tax Court of Indiana.

Dec. 29, 1992.

Thomas A. Withrow, C. Daniel Yates, B. Keith Shake, James H. Rownd, Henderson Daily Withrow & DeVoe, Indianapolis, for petitioner.

Linley E. Pearson, Atty. Gen., Marilyn Meighen, Deputy Atty. Gen., Indianapolis, for respondents.

FISHER, Judge.

The Petitioner, Harlan Sprague Dawley, Inc. (HSD), appeals the denial of its claim for refund of gross retail and use taxes (sales taxes) assessed by the Respondent, Indiana Department of State Revenue (the Department). The matter is before the court on the parties' several motions for partial summary judgment.

## ISSUES

The parties' motions raise the following issues:

I. Whether HSD's operations fall within the terms of the exemption provisions of IND.CODE 6–2.5–5–1, 6–2.5–5–2, 6–2.5–5–3, 6–2.5–5–5.1, and 6–2.5–5–6.

II. Whether HSD is entitled to the sales tax exemption under IND.CODE 6–2.5–4–5 for the purchase of utility services.

III. Whether a violation of Indiana's "ascertainable standards" rule amounts to an unconstitutional deprivation of federal due process rights, thereby creating liability under 42 U.S.C. § 1983.

## FACTS

In the field of laboratory rat breeding, HSD is an industry leader. HSD uses specialized techniques to breed and raise rats that are genetically different from their naturally occurring relatives. To ensure it continues to develop and perpetuate desired strains of rats suitable for sale to its public and private research laboratory customers, HSD breeds and raises the animals in a tightly controlled environment. HSD maintains pedigree records of its different rat colonies and selects breeding groups from those colonies based on the strains of offspring it desires to produce.

The breeding, gestation, and rearing take place in a quarantined environment in which the air is filtered, constant temperatures are maintained, and specific hours of light and darkness are established to maximize health and reproductive capacity. Moreover, because the rats' purchasers require specimens free from all viruses and other pathogens, the rats' environment is sealed off from the outside world to remain free of foreign contaminants at all times. Employees who work with the rats go through a twenty minute sterilization procedure before commencing work. While on duty, the employees wear sterile surgical masks, gowns, and shoes and take their lunch break in the sealed environment. Using autoclaves that produce steam heat of 250 degrees Fahrenheit, the employees sterilize the rats' food and bedding, filter the rats' water, and clean the rats' cages on strict schedules.

In the end, HSD's labors yield individual animals that are physically and genetically different from rats that occur in nature. Having been reared in a sterile and quarantined environment, HSD's rats are unable

to thrive outside the laboratory setting, and, as with other animals whose breeding is controlled by humans, HSD's rats represent particularized strains with particularized desired characteristics. For example, one strain of HSD's rats is used solely in blood pressure testing and another is bred exclusively for use in AIDS testing.

After a 1986 audit, the Department determined HSD owed sales tax on its purchases of supplies, utilities, and equipment. HSD paid the tax, and, after its claim for refund was denied, brought this original tax appeal. Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION

### STANDARD OF REVIEW

 Summary judgment is proper only when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. *C & C Oil Co. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 570 N.E.2d 1376, 1378. If no genuine issue of material fact exists, either the movant or the non-movant may be granted summary judgment. *Id.* (citing *Indianapolis Pub. Transp. Corp. v. Indiana Dep't of State Revenue* (1987), Ind.Tax, 512 N.E.2d 906, 907, *aff'd* (1990), Ind., 550 N.E.2d 1277).

For purposes of the present motions, the critical dispute between the parties is the legal question whether HSD is engaged in manufacturing or agriculture for purposes of exemptions from the gross retail tax. Resolution of all other issues hinges on HSD's status, and the parties at this stage do not dispute the facts of HSD's business, but rather the legal effect of those facts.

## I

### THE INDUSTRIAL EXEMPTIONS

HSD claims its purchases of certain items used in its operation are exempt from sales taxes under IC 6–2.5–5–3 (the equipment exemption), 6–2.5–5–5.1 (the consumption exemption), and 6–2.5–5–6 (the incorporation exemption). These statutes, collec-

tively referred to as the industrial exemptions, exempt from the sales tax certain purchases of tangible personal property used, consumed, or incorporated into other tangible personal property. During the years in issue, the industrial exemptions provided:

> Transactions involving manufacturing machinery, tools, and equipment are exempt from the state gross retail tax if the person acquiring that property acquires it for his direct use in the direct *production, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing* of other tangible personal property.

IC 6–2.5–5–3 (emphasis added).

> Transactions involving tangible personal property are exempt from the state gross retail tax if the person acquiring the property acquires it for his direct consumption as a material to be consumed in the direct production of other tangible personal property in his business of *manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture.*

IC 6–2.5–5–5.1 (emphasis added).

> Transactions involving tangible personal property are exempt from the state gross retail tax if the person acquiring the property acquires it for incorporation as a material part of other tangible personal property which the purchaser *manufactures, assembles, refines, or processes* for sale in his business.

IC 6–2.5–5–6 (emphasis added).[1]

Under these exemptions, the first question is whether, as HSD argues, its activities fall within the definitions of manufacturing or any of the exemption provisions. The Department responds that rat breeding does not fit within the traditional definition of manufacturing. Because the statutes do not define manufacturing or any of the other exemption provisions, the court turns to the rules of statutory construction to determine HSD's eligibility for exemption.

---

1. P.L. 78–1989 included tire retreading and commercial printing within the ambit of the industrial exemptions, but made no other substantive changes.

## A. Statutory Construction

When construing a statute, words and phrases are to be given their plain, ordinary, and usual meaning unless the legislature's intent reveals a contrary purpose. *Hartman v. State* (1992), Ind., 602 N.E.2d 1011, 1013; *Park 100 Dev. Co. v. Indiana Dep't of State Revenue* (1981), Ind., 429 N.E.2d 220, 222; *Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 580–81, *aff'd* (1992), Ind., 585 N.E.2d 1336. When a statute creates an exemption from tax, it must be strictly construed against the taxpayer. *General Motors Corp. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 578 N.E.2d 399, 404, *aff'd* (1992), Ind., 599 N.E.2d 588. Nonetheless, "the intent of the legislature embodied in a statute constitutes the law," *Johnson County*, 568 N.E.2d at 580, (citing *Wedmore v. State* (1954), 233 Ind. 545, 551, 122 N.E.2d 1, 4), and the court's foremost goal in construing statutes is to ascertain and give effect to the legislature's true intent. *Id.* (citing *Scheid v. State Bd. of Tax Comm'rs* (1990), Ind.Tax, 560 N.E.2d 1283, 1286). When construing an exemption, therefore, the court must always bear the legislature's intent in mind to avoid reading the exemption so narrowly its application is defeated in cases rightly falling within its ambit. *General Motors*, 578 N.E.2d at 404 (citing *Johnson County*, 568 N.E.2d at 580). Statutes are to be construed in the context of the whole act of which they are a part, giving effect, if possible, to each word and clause, *Guinn v. Light* (1990), Ind., 558 N.E.2d 821, 823 (citing *Doughty v. State Dep't of Public Welfare* (1954), 233 Ind. 213, 117 N.E.2d 651), and statutes applying to the same subject matter must be construed in harmony with one another. *Caylor–Nickel Clinic, P.C. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 569 N.E.2d 765, 768, (citing *Marion County Sheriff's Merit Bd. v. Peoples Broadcasting Corp.* (1989), Ind., 547 N.E.2d 235, 237), *aff'd* (1991), Ind., 587 N.E.2d 1311.

## B. Manufacturing

The parties have expended a great deal of effort debating the meaning of "manufacture." This is understandable. "Manufacturing is not easy to define since it has many applications and meanings that vary depending upon the circumstances of its use." *Jackson Excavating Co. v. Administrative Hearing Comm'n* (1983), Mo., 646 S.W.2d 48, 49 (citing *State ex rel. A.M.F. v. Spradling* (1974), Mo., 518 S.W.2d 58, 60). The word, as it is "used in tax statutes is not susceptible of a definition that is exact and all-embracing." Annotation, *What Constitutes Manufacturing and Who is a Manufacturer Under Tax Laws*, 17 A.L.R.3d 7, 22–23 (1968).

In *Anheuser–Busch Brewing Ass'n v. United States* (1908), 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336, the United States Supreme Court rejected a brewer's claim that it manufactured the corks it used to seal its beer bottles. The court stated

> [m]anufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft v. Wiegmann*, 121 U.S. 609 [7 S.Ct. 1240, 30 L.Ed. 1012]. There must be transformation; a new and different article must emerge, 'having a distinctive name, character or use.' This cannot be said of the corks in question. A cork put through the claimant's process is still a cork.

*Id.* 207 U.S. at 562, 28 S.Ct. at 206–07, 52 L.Ed. at 338. Some thirty years later, in a gross income tax case, our supreme court quoted with approval the following definition from *State v. American Creosote Works* (1927), 163 La. 547, 112 So. 412:

> 'A manufacturer is defined to be: One who is engaged in the business of working raw materials into wares suitable for use, (or) who gives new shapes, new qualities, new combinations to matter which has already gone through some artificial process. A manufacturer prepares the original substance for use in different forms. He makes to sell, and stands between the original producer and the dealer, or first consumers, depending

for his profit on the labor which he bestows on the raw material.'

*Indiana Creosoting Co. v. McNutt* (1936), 210 Ind. 656, 665, 5 N.E.2d 310, 314. The language in both these cases emphasizes that, to constitute manufacturing, a change or transformation of some sort must occur, that a new product distinct from its inputs must emerge. HSD claims that *Anheuser–Busch* and *Indiana Creosoting* are not dispositive of the case at bar. The Department counters that, like Anheuser–Busch's corks, a rat put through HSD's operation is still a rat because reproduction is a natural act regardless of the surrounding circumstances. HSD is correct.

As discussed above, "manufacture" is a malleable word, with different definitions in different contexts, and *Anheuser–Busch* is not binding precedent in the present case. Moreover, although *Indiana Creosoting* supports the Department's position that a transformation must occur to constitute manufacturing, *Indiana Creosoting* is not the last word on manufacturing in Indiana. *Indiana Creosoting* was decided before the industrial exemptions were enacted,[2] and in *Indiana Dep't of State Revenue v. Cave Stone, Inc.* (1983), Ind., 457 N.E.2d 520, our supreme court analyzed IND.CODE 6–2–1–39(b)(6), the predecessor to IC 6–2.5–5–3, the equipment exemption.

The *Cave Stone* court ruled the equipment exemption was available for trucks used to haul stone from the trucker's quarry to the trucker's crusher, even though the trucks had no transformational effect on the stone. The court held that to require a transformational effect would be to read the equipment exemption more narrowly than the legislature intended. *Cave Stone*, 457 N.E.2d at 524.

The exemption provisions in the [equipment exemption] are not mutually exclusive; rather they provide a comprehensive description of various means of production. The terms used in the statute overlap and at times encompass each other. For example, 'production' may in-

clude manufacture, fabrication, assembly, processing, refining, and/or finishing.... *The production process is continuous and indivisible.*

*Id.* (emphasis added). Indeed, the court went so far as to employ the terms of the exemption provisions interchangeably without using any separate definitions:

The issue, then, is whether the transportation is an integral part of the production *or* processing of the stone. We hold that under the facts of this case the equipment was directly used by the [taxpayer] in the direct *production, manufacture, mining, processing or finishing* of tangible personal property within the terms of [the equipment exemption].

*Id.* (emphasis added). To ensure that the equipment exemption, although construed against the taxpayer, was not improperly narrowed, the court defined "production" expansively:

In an economic sense, production includes *all* activity directed to increasing the number of scarce economic goods. It is not simply the manual, physical labor involved in changing the form or utility of a tangible article. *Borden Co. v. Borella* (1945), 325 U.S. 679, 683, 65 S.Ct. 1223, 1225, 89 L.Ed. 1865, 1869.

Production: something that is produced *naturally* or as a result of labor and effort; the act or process of producing, bringing forth or making; the creation of utility, the making of goods available for human wants. *Webster's Third Law International Dictionary* 1810 (unabridged ed. 1971).

*Id.* (emphasis added) (quoting *Indiana Dep't of State Revenue v. Cave Stone, Inc.* (1980), Ind.App., 409 N.E.2d 690, 698 (Buchanan, J., dissenting)). This expansive definition of "production," which includes natural acts, coupled with the overlapping nature of the exemption provisions, means that HSD's claim under the equipment exemption is not determined by whether HSD's operation fits within the term "manufacture." The same holds true for HSD's

**2.** *Suabedissen–Wittner Dairy, Inc. v. Department of Treasury* (1938), 105 Ind.App., 626, 16 N.E.2d 964, which held that pasteurization did not con-

stitute manufacturing under the gross income tax law, was also decided before the industrial exemptions were adopted.

claim under the consumption and the incorporation exemptions.

In *Cave Stone*, only the equipment exemption was at issue, and the court had no occasion to rule on either the consumption or the incorporation exemption. At the time *Cave Stone* was decided, however, all the industrial exemptions were contained within IC 6–2–1–39. Additionally, all the industrial exemptions are part of the same act, cover the same subject matter, use the same language to list the exemption provisions, and, as discussed below, were motivated by the same legislative intent. Accordingly, the court applies *Cave Stone's* overlapping definitions of the statutory terms and the expansive meaning of "production" to the language in the consumption and incorporation exemptions, as well as in the equipment exemption. *See Marion County Sherrif's Merit Bd.*, 547 N.E.2d 235, 237 (when two statutes apply to the same subject matter, the first rule of statutory construction is to harmonize those statutes if at all possible); *Department of Treasury v. Muessel* (1941), 218 Ind. 250, 258, 32 N.E.2d 596, 599 (words repeated in the same manner in one statute are presumed to have the same meaning); *Indiana Tel. Ass'n v. Public Service Comm'n* (1985), Ind.App., 477 N.E.2d 911, 917 (words repeated throughout the same Act are given the same meaning unless the context requires a different meaning).

In addition to debating the effect of *Cave Stone*, the parties go to great lengths to answer whether natural processes, like rat breeding, can constitute manufacturing. There is, however, no one settled rule. *See, e.g., Holloway v. State* (1955), 262 Ala. 437, 79 So.2d 40 (taxpayer who bought baby chicks, left them with farmers for six to eight weeks until the chicks were big enough to cook, then retrieved them and sold them for slaughter was not entitled to the manufacturing exemption from sales tax); *Hervey v. Tyson's Foods, Inc.* (1972), 252 Ark. 703, 480 S.W.2d 592 (chicken processors are not manufacturers); *Zoller Brewing Co. v. Iowa State Tax Comm'n* (1942), 232 Iowa 1104, 5 N.W.2d 643, *modified*, 6 N.W.2d 843 (the brewing of beer constitutes manufacturing); *Smith v.*

*State* (1958), La.App., 100 So.2d 524, *cert. denied* (preparing and packing dry beans constitutes manufacturing); *Perdue Foods, Inc. v. State Dep't of Assessments & Taxation* (1972), 264 Md. 672, 288 A.2d 170 (handling chickens from the time of incubation to slaughter constitutes manufacturing); *Master Hatcheries v. Coble* (1975), 286 N.C. 518, 212 S.E.2d 150 (commercial raising of baby chicks constitutes manufacturing under North Carolina sales tax statute); *Miller v. Peck* (1952), 158 Ohio St. 17, 47 O.O. 485, 106 N.E.2d 776 (commercial chicken hatchery's machinery was the artificial means of developing and transforming eggs into chicks, and was, therefore, entitled to the tax exemption for manufacturing); *Commonwealth v. Babcock Lumber Co.* (1971), 1 Pa.Cmwlth. 45, 272 A.2d 522 (drying of fresh lumber does not constitute manufacturing); *Stokely–Van Camp, Inc. v. State* (1957), 50 Wash.2d 492, 312 P.2d 816 (preparing, freezing, and packaging of fruits and vegetables constitutes manufacturing).

The Department also places great reliance on two cases applying other states' industrial type exemptions to the breeding and raising of laboratory rats: *State Tax Commissioners v. Flow Research Animals, Inc.* (1981), 221 Va. 817, 273 S.E.2d 811, and *Charles River Breeding Laboratories, Inc. v. State Tax Comm'n* (1978), 374 Mass. 333, 372 N.E.2d 768. In *Flow Research*, the Virginia Supreme Court rejected the breeder's argument that it was engaged in "processing" for purposes of a sales tax exemption because breeding was a natural act. In *Charles River*, the Supreme Judicial Court of Massachusetts held the taxpayer's operation did not constitute manufacturing. Of course, neither of these cases is controlling precedent in the case at bar. But even more important, the court finds them unpersuasive.

The *Flow Research* court viewed natural acts as beyond the scope of "processing," while the controlling Indiana Supreme Court precedent in *Cave Stone* and the Department's regulations, as will be dis-

cussed below, take a contrary view.[3] Similarly, the manufacturing exemption at issue in *Charles River* was animated by the Massachusetts legislature's desire to rescue dying mills during the Great Depression, 374 Mass. at 336, 372 N.E.2d at 770, while Indiana's industrial exemptions, as will also be discussed below, reflect a vastly different legislative intent.

Notwithstanding the continuing debate in other states, in Indiana it is not imperative to settle on one fixed definition of "manufacturing" to determine a taxpayer's eligibility for the industrial exemptions. The legislature's intent and the Department's own regulations, as well as the rule in *Cave Stone*, demonstrate HSD is entitled to prove its purchases were made for "processing" or "production" under the industrial exemptions.

### C. Legislative Intent

Because "[t]he intent of the legislature embodied in a statute constitutes the law," *Johnson County*, 568 N.E.2d at 580, the court's foremost goal in construing a statute is to ascertain and give effect to the legislature's intent in enacting the statute. *Id.* In the case at bar, "[t]he legislative purposes of the manufacturer's exemptions are well recognized. The first is the 'obvious legislative purpose to encourage industrial growth by allowing an exemption for items closely connected with the *production of goods.*'" *General Motors*, 578 N.E.2d at 404 (emphasis added) (quoting *Indiana Dep't of State Revenue v. Indiana Harbor Belt R.R. Co.* (1984), Ind. App., 460 N.E.2d 170, 175). In the context of the industrial exemptions, "production" is viewed expansively as "all activity directed to increasing the number of scarce economic goods." *Cave Stone*, 457 N.E.2d at 524. HSD's rats, selected for their breed-

ing qualities, live in a carefully controlled environment and produce individual offspring through the natural reproductive process. Through HSD's labor, the offspring, like the parents, are raised to be virus and pathogen free. The offspring are then sold. HSD's rats are scarce economic goods; they have value and are sold to satisfy human wants. Therefore, HSD's operation fits within the legislature's intent to encourage industrial growth.

The other legislative goal of the industrial exemptions is to prevent tax pyramiding:

'All sales tax laws exempt or exclude some retail sales. The reasons for this treatment vary. Goods used in the manufacturing process are exempt entirely or partially by all state laws to avoid tax pyramiding, that is, the situation where a tax is levied on a tax and the result is a retail price increase greater than the amount of the tax.'

*General Motors*, 578 N.E.2d at 405 (quoting *Welsh v. Sells* (1963), 244 Ind. 423, 434–35, 192 N.E.2d 753, 759–60, 193 N.E.2d 359). If HSD's inputs are taxed, HSD will be likely to pass along the tax to its buyers in research laboratories. In turn, the labs will be likely to pass on their added costs to the consumers, for example, people taking AIDS or hypertension tests which utilize HSD rats in their development. Part of the sales tax assessed on the final purchase will then be a tax upon a tax–tax pyramiding. This multiple layering of costs is precisely the evil the legislature sought to avoid when it enacted the gross retail tax and the manufacturing exemptions in 1963.

### D. Regulations

45 IAC 2.2–5–10 is one of the Department's regulations applying the equipment exemption.[4] Under subsection k of the regulation,

---

**3.** As with "manufacturing," there is disagreement among the states on whether a natural act or operation can constitute "processing." *See, e.g., Fischer Artificial Ice & Cold Storage Co. v. Iowa State Tax Comm'n* (1957), 248 Iowa 497, 81 N.W.2d 437 (processing, in its plain meaning, includes freezing of fresh meats and vegetables and aging of cheese); *Mississippi Valley Milk Producers Ass'n v. Iowa Dep't of Revenue* (1986), Iowa App., 387 N.W.2d 611 (sales of electricity

for heating milk cans in preparation for sealing were exempt as sales for processing); *Jackson Excavating Co.*, 646 S.W.2d 48 (making water potable is a process for sales tax purposes).

**4.** The equipment exemption, IC 6–2.5–5–3, exempts "[t]ransactions involving manufacturing machinery, tools, and equipment ... if the person acquiring that property acquires it for his direct use in the direct production, manufac-

[p]rocessing or refining is defined as the performance by a business of an integrated series of operations which places tangible personal property in a form, composition, or character different from that in which it was acquired. The change in form, composition, or character must be a substantial change. Operations such as distilling, brewing, pasteurizing, electroplating, galvanizing anodizing, *impregnating,* cooking, heat treating, and slaughtering of animals for meal or meal products are illustrative of the types of operations which constitute processing or refining, although any operation which has such a result may be processing or refining. A processed or refined end product, however, must be substantially different from the component materials used.

45 I.A.C. 2.2–5–10(k) (emphasis added).

HSD breeds rats, which means it manages and controls its rats' impregnation, gestation, birth, and development to produce individuals with desired qualities. *See Webster's Third New Int'l Dictionary* at 274 (1981). "The production process is continuous and indivisible." *Cave Stone,* 457 N.E.2d at 524. Therefore, under the Department's interpretation, HSD's operation is a process for purposes of the equipment exemption. The Department's " 'interpretation of the statutory scheme it administers is entitled to judicial deference....' " *Johnson County,* 568 N.E.2d

at 586 (quoting *City of Evansville v. Southern Indiana Gas & Elec. Co.* (1975), 167 Ind.App. 472, 496, 339 N.E.2d 562, 578).

Regulations are subject to the same rules of construction as statutes. *Caylor–Nickel Clinic,* 569 N.E.2d at 771 (citing *Johnson County,* 568 N.E.2d at 568). Regulations that deal with the same subject matter, such as those applying the industrial exemptions, must therefore be construed in context and harmonized if at all possible. *Guinn,* 558 N.E.2d at 823.

As discussed in footnote 3, *supra,* there are six regulations, 45 I.A.C. 2.2–5–8, 9, 10, 12, 13, and 14, applying the industrial exemptions. Of these, only one, 45 I.A.C. 2.2–5–10(k), defines processing, and none of the others directly or impliedly rejects the definition given in 45 I.A.C. 2.2–5–10(k). Accordingly, under the rules of construction, all the Department's relevant regulations must be construed to include "impregnation" within the meaning of "processing," and given this construction, HSD's operation is exempt under the Department's regulations for all three of the industrial exemptions.

*Conclusion*

When the legislature enacted the industrial exemptions, it intended to encourage industrial growth and avoid tax pyramiding. In *Cave Stone,* our supreme court, mindful that exemptions are to be construed against the taxpayer, nonetheless found that "production" is to be given an

---

ture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property." The Department has divided the statute's exemption provisions into three categories in its regulations.

45 I.A.C. 2.2–5–8(b) governs equipment "directly used in the direct production, manufacture, fabrication, assembly, or finishing of tangible personal property." 45 I.A.C. 2.2–5–9(a) governs equipment "directly used by the purchaser in extraction or mining." 45 I.A.C. 2.2–5–10(b) governs equipment "directly used by the purchaser in processing or refining tangible personal property."

Similarly, the Department has divided the exemption provisions under the consumption exemption into two categories. Under IC 6–2.5–5–5.1, "[t]ransactions involving tangible personal property are exempt from the state gross retail tax if the person acquiring the property acquires it for his direct consumption as a material to be

consumed in the direct production of other tangible personal property in his business of manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture."

45 I.A.C. 2.2–5–12(b) applies to "tangible personal property directly consumed in direct production by manufacturing, processing, refining, or mining," while 45 I.A.C. 2.2–5–13(a) applies to tangible personal property directly consumed in direct production ... of agricultural, horticultural, floricultural, or arboricultural commodities."

The Department has not, however, divided the exemption provisions under the incorporation exemption. IC 6-2.5-5-6 exempts tangible personal property incorporated "as a material part of other tangible personal property which the purchaser manufactures, assembles, refines, or processes. 45 I.A.C. 2.2–5–14 is the only regulation applying IC 6-2.5-5-6.

expansive meaning to fulfill the legislature's intent, and that the exemption provisions are overlapping. In turn, the Department adopted a regulatory scheme that specifically includes impregnation as a "process" within the meaning of the industrial exemptions.

HSD's operation fits squarely within the legislature's purpose in enacting the industrial exemptions. It also conforms to the rules stated in *Cave Stone* and to the Department's interpretation of the exemptions. Using several different types of inputs upon which a tax pyramid would rest if the exemptions did not exist, HSD's operation propagates laboratory rats, producing scarce economic goods for human use and encouraging various industrial activities. HSD is therefore entitled to the benefits of the industrial exemptions if it can meet its burden to show which of its purchases meet the requirements of the industrial exemptions.

*Exhibit A* of HSD's answers to interrogatories lists the purchases HSD claims are exempt. The parties have not, however, presented evidence in their motions to show whether or not these purchases qualify for the industrial exemptions, either as equipment directly used in direct production, or tangible personal property incorporated or directly consumed in the production of other tangible personal property. The specific purchases, therefore, are not subject to resolution by summary judgment and the case must proceed to trial.[5]

## II

### THE UTILITY EXEMPTION

 HSD next claims its purchases of utility services are exempt from sales tax. Sales of utility services are exempt from sales tax when

> the [seller] sells the [utility] services ... to a person for use in *manufacturing, mining, production, refining, oil extraction, mineral extraction, irrigation, agriculture, or horticulture.* However, this exclusion for sales of the services and commodities only applies if those sales are separately metered for the excepted uses listed in this subsection, or if those sales are not separately metered but are predominantly used by the purchaser for the excepted uses listed in this subsection.

IND.CODE 6–2.5–4–5(c) (emphasis added). Nothing in the context of this statute demonstrates its exemption provisions are to have a different meaning than those in the industrial exemptions, and the court therefore gives the utility exemption provisions the same meanings as their counterparts in the industrial exemptions. *Indiana Tel. Ass'n,* 477 N.E.2d at 917.

Given the court's holding that HSD falls within the ambit of the industrial exemptions, HSD is also entitled to show it made exempt utility purchases. *See Chrome Deposit Corp. v. Indiana Dep't of State Revenue* (1990), Ind.Tax, 557 N.E.2d 1110, 1117, *aff'd,* (1991), Ind., 578 N.E.2d 643. As with the specific purchases claimed to fall within the industrial exemptions, however, no issue of HSD's specific utility purchases is before the court, and the case must therefore proceed to trial.[6]

## III

### "ASCERTAINABLE STANDARDS"

The main thrust of the Department's reasoning, from the time it assessed the tax at

---

5. Because of the court's disposition of HSD's claim under the industrial exemptions, the court does not address HSD's claim its purchases are exempt under either the agricultural clause of IC 6–2.5–5–5.1 or IC 6–2.5–5–1 and 6–2.5–5–2.

6. HSD was a member of the class in the class action case of *K–Whit Tools, Inc. v. Indiana Dep't of State Revenue,* Ind.Tax No. 49T05–8709–TA–00038. That case, which also involved the utility exemption, was terminated by a November 16, 1990 order of this court approving the parties' settlement agreement.

In the case at bar, the Department has tendered the uncontroverted affidavit of Mark K. Phillips, an employee of the Department. Mr. Phillips avers that HSD, as a member of the class, received the settlement of its claim for return of sales tax under the utility exemption for the years 1985 through 1989. Accordingly, HSD is bound by the terms of the settlement, and only those tax years not covered by the settlement remain at issue.

issue until today, has been that rat breeding does not comport with traditional notions of either manufacturing or agriculture. The Department has not, however, promulgated any regulations that specifically address HSD's industry. Relying on the line of cases beginning with *Podgor v. Indiana University* (1978), 178 Ind.App. 245, 381 N.E.2d 1274, *trans. denied,* HSD argues the Department's course of conduct has been unconstitutional.

Under *Podgor* and its progeny, "administrative decision[s] must be in accord with previously stated, ascertainable standards" to satisfy the due process requirements of the Fourteenth Amendment to the United States Constitution. *Harrington v. State Bd. of Tax Comm'rs* (1988), Ind.Tax, 525 N.E.2d 360, 361 (quoting *Podgor* at 258, 381 N.E.2d at 1283). According to HSD's reasoning, the Department violated the "ascertainable standards" rule of *Podgor* when it rejected HSD's claim for refund without reference to a specific regulation applicable to the laboratory rat breeding industry. Consequently, HSD reasons, the Department violated HSD's due process rights. To remedy the alleged violation, HSD has brought a claim for relief under 42 U.S.C. § 1983 (§ 1983) seeking attorney fees under 42 U.S.C. § 1988 (§ 1988).

In *Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 583 N.E.2d 214, this court held it had subject matter jurisdiction to entertain HSD's § 1983 claim. The issue now before the court is whether a violation of Indiana's "ascertainable standards" rule amounts to a deprivation of constitutional due process rights for which a § 1983 action will lie.[7] The initial inquiry, therefore, is necessarily whether a violation of Indiana's "ascertainable standards" rule has occurred.

As discussed in Section I, *supra,* the Department has promulgated several regu-

lations to implement the industrial exemptions. In each of these, taxpayers are given notice of the industrial exemptions' requirements. For example, 45 I.A.C. 2.2–5–10, the regulation implementing the equipment exemption for processors like HSD, not only defines "impregnating" as a process, but also explains the requirement that the equipment produce an "immediate effect" on the tangible personal property being processed. 45 I.A.C. 2.2–5–10(g). Similarly, 45 I.A.C. 2.2–5–12, the regulation implementing the consumption exemption for processors, defines direct consumption in the production process. 45 I.A.C. 2.2–5–12(d)(1). 45 I.A.C. 2.2–5–14, the regulation implementing the incorporation exemption, provides a detailed analysis to determine whether material has been incorporated into the finished product. 45 I.A.C. 2.2.–5–14(d).

With the exception of "impregnating" as a process under 45 I.A.C. 2.2–5–10(k), the regulations do not specifically address themselves to HSD. Neither, however, do they address themselves specifically to any other taxpayer, and more importantly, they are not required to. It is well settled that Indiana's "ascertainable standards" rule does not hold agencies to a higher standard of specificity than circumstances permit considering the purpose of the regulations in question. *See Johnson v. Kosciusko County Drainage Bd.* (1992), Ind.App., 594 N.E.2d 798, 803 (citing *Natural Resources Comm'n v. Sullivan* (1981), Ind.App., 428 N.E.2d 92, 101). In the case at bar, the regulations are designed to implement the legislature's goals of encouraging industrial growth and avoiding tax pyramiding through use of the industrial exemptions, and they accomplish their goal. There was no violation of Indiana's "ascertainable standards" rule.[8]

Because there was no violation of Indiana's "ascertainable standards" rule,

---

7. The phrase "ascertainable standards" is here limited to its use in administrative law. It is also employed in both First Amendment and criminal jurisprudence, *see, e.g., Smith v. Goguen* (1974), 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605, and *Williams v. United States* (1951), 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774, but its use in those contexts is not relevant to the case at bar.

8. In reality, HSD complains not about the regulations, but rather about the Department's error of law, that is, the Department's conclusion that HSD's operation did not fall within the ambit of the industrial exemptions. To read Indiana's "ascertainable standards" rule as HSD does would require administrative agencies to have the foresight to decide (and decide properly) in

the court does not address the issue of whether a violation of the rule amounts to an unconstitutional deprivation of due process.[9] "It is 'the duty of the court not to enter upon the consideration of a constitutional question where the court can perceive another ground on which it may properly rest its decision.'" *Bayh v. Sonnenburg* (1991), Ind., 573 N.E.2d 398, 402 (quoting *Bureau of Motor Vehicles v. Scott* (1986), Ind., 497 N.E.2d 557, 559), *cert denied* (1992), —— U.S. ——, 112 S.Ct. 1170, 117 L.Ed.2d 415. Therefore, for all of the foregoing reasons, HSD's § 1983 claim fails.

## CONCLUSION

HSD's operation falls within the ambit of the industrial exemptions and the utility exemption. HSD is therefore entitled to show whether its purchases are exempt under the exemptions. HSD has not, however, suffered a violation of Indiana's "ascertainable standards" rule, and accordingly, has no claim for relief under § 1983.

The court therefore DENIES the Department's motion for partial summary judgment on the issue of whether HSD falls within the ambit of the industrial exemptions, and because there is no genuine issue of material fact on this question, the court GRANTS partial summary judgment to HSD. With the proviso already noted, the court GRANTS HSD's motion for partial summary judgment on the issue of the utility exemption. The court DENIES HSD's motion for partial summary judgment on the issue of HSD's § 1983 claim for relief, and because there is no genuine issue of material fact on this question, the court GRANTS partial summary judgment to the Department.

---

advance the resolution of all possible fact situations presented to them or face a § 1983 action. This cannot be. Administrative agencies make errors of law, and the courts stand ready to cure those errors because "an administrative interpretation that is incorrect is entitled to no weight." *Johnson County,* 568 N.E.2d at 586 (citing *Lake County Beverage Co. v. 21st Amendment, Inc.* (1982), Ind.App., 441 N.E.2d 1008, 1014). The "ascertainable standards" rule, though, is merely a method courts use to ensure agencies act within the limits of their discretion. It does not require agencies to be prescient. *See, e.g., Indiana Dep't of Envtl. Management v. Amax, Inc.* (1988), Ind.App., 529 N.E.2d 1209, 1212–13 (discussing the distinction between an agency's legislative and adjudicative functions).

**9.** It appears the rule as it now stands exists as a common law rule of administrative law, adopted for Indiana by the *Podgor* court. The rule serves to aid judicial review, *Community Care Centers, Inc. v. Indiana Dep't of Pub. Welfare* (1988), Ind.App., 523 N.E.2d 448, 450, and is also a shorthand method of stating that agencies must adhere to the requirements of IND. CODE 4–22–2 to issue regulations. *See County Dep't of Pub. Welfare v. Deaconess Hosp., Inc.* (1992), Ind.App., 588 N.E.2d 1322, 1328, n. 2, *trans. denied.*

Notwithstanding, however, the rule's obscure origin in the early equal protection case of *Yick Wo v. Hopkins* (1886), 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, and its more recent antecedents of the 1960s and 1970s, *see Holmes v. New York City Housing Authority* (2nd Cir.1968), 398 F.2d

262; *Barnes v. Merritt* (5th Cir.1967), 376 F.2d 8; *Hornsby v. Allen* (5th Cir.1964), 326 F.2d 605; *Harnett v. Board of Zoning, Subdivision and Bldg. Appeals* (D.V.I.1972), 350 F.Supp 1159, there is little, if any, support for the idea that our "ascertainable standards" rule defines a federal right rather than a common law rule employed in many jurisdictions. *See, e.g., State, ex rel. Comm'r of Ins. v. North Carolina Rate Bureau* (1980), 300 N.C. 381, 269 S.E.2d 547; *Athay v. State* (1981), Utah, 626 P.2d 965. As the Fourth Circuit Court of Appeals aptly noted, "[t]he concern of [the *"Holmes"* and other "ascertainable standard"] courts was 'to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries.'" *Harris v. Lukhard* (4th Cir.1984), 733 F.2d 1075, 1080 (quoting *Morton v. Ruiz* (1974), 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270, 292.

Perhaps the clearest indication the rule lacks the talismanic status HSD claims is found in the Supreme Court's reversal of *Pension Benefit Guaranty Corp. v. LTV Corp.* (2nd Cir.1989), 875 F.2d 1008. In that case, the Second Circuit Court of Appeals, relying on the same "ascertainable standards" language from *Holmes,* 398 F.2d at 265, as *Podgor* relied on, remanded a case to the administrative agency. *Pension Benefit Guaranty Corp.* 875 F.2d at 1020. The Supreme Court granted certiorari and reversed on several grounds. Regarding the "ascertainable standards" language, the Court simply stated "we are not exactly sure what the Court of Appeals meant" by the phrase. *Pension Benefit Guaranty Corp. v. LTV Corp.* (1990), 496 U.S. 633, 655, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579, 600–01.