ATTORNEYS FOR PETITIONER:
**RANDAL J. KALTENMARK**
**ZIAADDIN MOLLABASHY**
BARNES & THORNBURG, LLP
Indianapolis, IN

**MARK S. BERNSTEIN**
AKERMAN LLP
Chicago, IL

ATTORNEYS FOR RESPONDENT:
**GREGORY F. ZOELLER**
INDIANA ATTORNEY GENERAL
**JOHN P. LOWREY**
**ANDREW T. GREIN**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN



FILED

Aug 10 2016, 4:12 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

BRANDENBURG INDUSTRIAL SERVICE )
COMPANY, an Illinois corporation, )
                        )
      Petitioner, )
                        )
             v. )      Cause No. 49T10-1206-TA-00037
                        )
INDIANA DEPARTMENT OF STATE )
REVENUE, )
                        )
      Respondent. )

## ORDER ON RESPONDENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**FOR PUBLICATION**
**August 10, 2016**

WENTWORTH, J.

Brandenburg Industrial Service Company has appealed the Indiana Department of State Revenue's denials of its claims for a refund of the sales and use tax remitted in 2006 and 2007 as well as its assessments of sales and use tax for the same period (the period at issue). The matter is currently before the Court on the Department's Motion

for Partial Summary Judgment and presents one issue for the Court to decide.[1] The Court restates the issue as whether Brandenburg was a producer of scrap steel eligible for exemption under Indiana Code § 6-2.5-5-3 (the Equipment Exemption) and Indiana Code § 6-2.5-5-5.1 (the Consumption Exemption) during the period at issue.[2] Upon review, the Court finds in favor of Brandenburg.

## FACTS AND PROCEDURAL HISTORY

Brandenburg is an Illinois corporation that primarily processes and sells ferrous and non-ferrous metal to steel manufacturers throughout the United States. (See Pet'r Des'g Evid., Aff. Jack Jasinowski ("Jasinowski Aff.") ¶¶ 27-28, 48.) Brandenburg engages in related businesses that provide access to the metal it processes and sells from its facilities in Illinois, Indiana, Pennsylvania, and Puerto Rico, such as the demolition of retired assets, environmental remediation (e.g., asbestos abatement, soil remediation, or hazardous material removal), and site preparation. (See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 27-28, 30-32; Resp't Des'g Evid., About the Company, BRANDENBURG.COM, http://www.brandenburg.com/AboutTheCompany.aspx (last visited Apr. 29, 2016).) Brandenburg's Indiana facility is located inside the United States Steel Corporation's Gary Works steel mill and is comprised of a scrap metal yard, a fabrication shop, a data processing center, a technology department, and a receiving department. (See Pet'r Des'g Evid., Jasinowski Aff. ¶ 27.)

---

[1] The issues not before the Court in this matter concern Brandenburg's eligibility for exemption under Indiana Code § 6-2.5-3-2 (the Temporary Storage Exemption) as well as the propriety, timeliness, and constitutionality of the Department's actions under Indiana Code § 6-8.1-3-3, Indiana Code § 6-8.1-5-2, and the Commerce Clause of the United States Constitution. (See Pet'r First Am. Pet. Refund Sales & Use Tax ¶¶ 40-62.)

[2] The parties have designated evidence that contains confidential information. Accordingly, the Court will only provide that information necessary for the reader to understand its disposition of the issue presented. See generally Ind. Administrative Rule 9.

Brandenburg acquires the metal that it processes either by directly purchasing retired assets (e.g., boats, machinery, or railroad scrap) or by performing services in its related businesses, such as building demolition or environmental remediation, in exchange for the metal. (See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 34-37; Resp't Des'g Evid., Ex. 9 ("L. Jasinowski Depo.") at 15-16.)  (See also Resp't Des'g Evid., Ex. 12 at 3837-38, Ex. 13 at 3871-72, Ex. 15 at 3882-83 (sample contract excerpts).)  Since 1993, Brandenburg has processed the metal using the following seven-step process:

1. **Identification:**  Identify the location, quantity, and alloy content/chemistry of the metal by reviewing pertinent documentation, visually inspecting the metal, and using a portable spectrometer;

2. **Removal:**  Remove the metal from the retired asset/building by either surgically extracting it from the object or demolishing the object and removing the metal from the debris;

3. **Decontamination:**  Remove contaminants, such as concrete, brick, wood, or insulation, from the metal retrieved in Step 2;

4. **Cutting:**  Reduce the oversized pieces of decontaminated metal for further transporting and processing by cutting the metal to more manageable sizes;

5. **Sorting:**  Separate the cut metal into various categories of ferrous (e.g., No. 1 heavy melt or plate and structural steel) and non-ferrous (e.g., copper, brass, nickel, aluminum, or stainless steel) metal;

6. **Preparation:**  Ensure the metals sorted in Step 5 meet customer specifications, which may require additional size, shape, or thickness alterations as well as additional sorting; and

7. **Staging:**  Stockpile the prepared metals in specific locations for future loading and transport to customers.

(See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 38-47, 51, 59-65, Exs. S-T.)  (See also Resp't Des'g Evid., Ex. 8 ("J. Jasinowski Depo.") at 84-85, 93-100.)

In December of 2009 and 2010, Brandenburg filed four refund claims with the Department in which it asserted that several items it used in processing metal were exempt from sales and use tax under the Equipment and Consumption Exemptions. (See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 8-9, 19-20, Exs. A-B, K-L.)  The Department ultimately denied all four of Brandenburg's refund claims by, among other things, issuing Proposed Assessments that in effect rescinded its prior approval of two of the four claims.  (See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 10-15, 21-22, Exs. C-H, M-N.) Brandenburg protested the Department's denials of its refund claims and the Proposed Assessments, which the Department subsequently denied.  (See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 16-17, 23-26, Exs. I-J, O-Q.)

On June 22, 2012, Brandenburg initiated this original tax appeal.  On November 16, 2015, after the Court resolved a procedural matter,[3] the Department moved for partial summary judgment and designated, among other things, its Proposed Assessments as evidence.  (See Resp't Des'g Evid., Exs. 1G-1H.)  On April 21, 2016, the Court held a hearing on the Department's Motion.  Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

Summary judgment is proper only when the designated evidence demonstrates that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Ind. Trial Rule 56(C).  A genuine issue of material fact exists when a fact concerning an issue that would dispose of the case is in dispute or when the undisputed material facts support conflicting inferences regarding the resolution of an

---

[3] See Brandenburg Indus. Serv. Co. v. Indiana Dep't State Revenue, 26 N.E.3d 147 (Ind. Tax Ct. 2015) (denying in part and granting in part Brandenburg's motion to compel).

4

issue.  <u>Miller Pipeline Corp. v. Indiana Dep't of State Revenue</u>, 995 N.E.2d 733, 734 n.1 (Ind. Tax Ct. 2013).  "When any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party."  T.R. 56(B).

**LAW**

During the period at issue, Indiana imposed a sales tax on retail transactions made in Indiana.  IND. CODE § 6-2.5-2-1(a) (2006).  Indiana also imposed a use tax when sales tax was not remitted on tangible personal property that was acquired in a retail transaction and was subsequently stored, used, or consumed in Indiana, regardless of where the retail transaction occurred or where the retail merchant was located.  <u>See</u> IND. CODE § 6-2.5-3-2(a) (2006).  <u>See</u> <u>also</u> <u>Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue</u>, 865 N.E.2d 725, 727 n.4 (Ind. Tax Ct. 2007) (providing that the use tax is complementary to the sales tax because it is designed to reach out-of-state purchases of tangible personal property that are subsequently used in Indiana), <u>review denied</u>.

Indiana also exempted certain retail transactions by the producers of goods from the imposition of sales and use tax (the Manufacturing Exemptions).  <u>See,</u> <u>e.g.</u>, <u>Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue</u>, 605 N.E.2d 1222, 1228 (Ind. Tax Ct. 1992); IND. CODE § 6-2.5-3-4(a) (2006).  For example, the Equipment Exemption exempted transactions involving manufacturing machinery, tools, and equipment from sales and use tax "if the person acquiring that property acquire[d] it for direct use in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property."  IND. CODE § 6-2.5-5-3(b)

5

(2006) (amended 2007). Likewise, the Consumption Exemption exempted transactions from sales and use tax "if the person acquiring the property acquire[d] it for direct consumption as a material to be consumed in the direct production of other tangible personal property in the person's business of manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture." IND. CODE § 6-2.5-5-5.1(b) (2006).

## ANALYSIS

The question before the Court is whether Brandenburg was a producer of scrap steel during the period at issue. The parties do not dispute where Brandenburg's process begins and ends, the absence of a chemically induced change in its raw material metals, or the marketability of its scrap metal end product. (See, e.g., Resp't Reply Supp. Resp't Mot. Summ. J. ("Resp't Reply Br.") at 3-5; Hr'g Tr. at 36-37, 48-51.) The Department's claim for partial summary judgment focuses on whether Brandenburg's process 1) falls within the scope of the Equipment and Consumption Exemptions and 2) substantially transforms its raw materials into new, marketable goods, i.e., produces "other tangible personal property." (Compare, e.g., Resp't Mem. Supp. Partial Summ. J. ("Resp't Mem.") at 5-7, 9-16 and Hr'g Tr. at 7-15 with Pet'r Resp. Resp't Mot. Partial Summ. J. ("Pet'r Resp. Br.") at 19-20, 26-30 and Hr'g Tr. at 55-60.)

### (1)

The Department claims that it is entitled to partial summary judgment because Brandenburg's demolition process is not an activity that is expressly stated in either the Equipment or the Consumption Exemption statutes. (See Resp't Mem. at 5-9.) The

6

Department explains that each exemption statute contains a specific list of activities that is "a 'comprehensive description of [the] various means of production[,]'" and the absence of an activity from either list "indicates that the activity probably is not production." (Resp't Mem. at 6-7 (citation omitted).) As a result, the Department asserts that because Brandenburg's demolition activities are not specifically listed exempt activities and are "inextricable" from its seven metal processing steps, Brandenburg is simply not engaged in production within the meaning or scope of either exemption as a matter of law.[4] (See Resp't Mem. at 6-7.)

Previously, this Court has explained that the lists of activities set forth in the Equipment and Consumption Exemption statutes are an <u>illustrative rather than an exhaustive</u> list of activities capable of transforming tangible personal property into a new, marketable product. <u>See, e.g.</u>, <u>Rotation Prods. Corp. v. Dep't of State Revenue</u>, 690 N.E.2d 795, 799 (Ind. Tax Ct. 1998) (explaining that a taxpayer's eligibility for manufacturing exemptions, like those at issue here, is not based on whether its operations or activities fit within one of the listed terms). Indeed, when the Indiana Supreme Court first examined the predecessor to the Equipment and Consumption Exemptions over thirty years ago, it interpreted the juxtaposition of the various activities expansively because a broad interpretation was the only way to give effect to the

---

4  The Department has also claimed that Indiana Code § 6-2.5-5-45.8 (the Recycling Exemption), which exempts comparable transactions from sales and use tax, supports its position because it expressly excludes demolition activities from the scope of that exemption. (See Resp't Mem. Supp. Partial Summ. J. ("Resp't Mem.") at 7-9.) Moreover, the Department claims that the 2015 amendment to the Equipment Exemption demonstrates that merely cutting metal is outside the scope of the exemptions as a matter of law. (See Resp't Mem. at 12-13; Resp't Reply Supp. Resp't Mot. Summ. J. ("Resp't Reply Br.") at 5-8.) The Court finds the Department's reliance on these two statutory provisions tenuous at best, considering that neither was in effect during the period at issue. See P.L. 137-2012, § 50; P.L. 250-2015, § 10. Accordingly, the Court will not address either claim in resolving this issue.

7

Legislature's intent of removing the burden of intermediate tax incidents from a taxpayer that increases the number of scarce economic goods. See Indiana Dep't of State Revenue v. Cave Stone, Inc., 457 N.E.2d 520, 523-24 (Ind. 1983).

Keeping this scope in mind, this Court has issued a plethora of decisions that focus on whether the facts in each case demonstrate that the taxpayer's integrated process transforms raw materials into new, marketable products. Indeed, the Court has consistently examined whether a taxpayer's integrated series of operations caused a substantial change or transformation in tangible personal property by placing it in a "form, composition, or character different from that in which it was acquired," i.e., a new product.[5] See, e.g., Indianapolis Fruit Co. v. Indiana Dep't of State Revenue, 691 N.E.2d 1379, 1383-86 (Ind. Tax Ct. 1998); Rotation Prods., 690 N.E.2d at 800-02; Mechanics Laundry & Supply, Inc. v. Indiana Dep't of State Revenue, 650 N.E.2d 1223, 1229-31 (Ind. Tax Ct. 1995); Harlan Sprague Dawley, 605 N.E.2d at 1226-29. See also 45 IND. ADMIN. CODE 2.2-5-8(k) (2006) (see http://www.in.gov/legislative/iac). The Court finds no reason to depart from this well-established method of analysis in favor of simply matching a taxpayer's activity to one of the examples identified in the Equipment or Consumption Exemption statutes. Accordingly, the Department is not entitled to partial summary judgment on this basis.

**(2)**

The Department also claims that it is entitled to partial summary judgment because there is no genuine issue of material fact that Brandenburg's seven-step

---

[5] The Department has urged the Court to apply the four-part test set forth in Rotation Products Corporation v. Department of State Revenue, 690 N.E.2d 795, 802-03 (Ind. Tax Ct. 1998). (See Resp't Mem. at 14-16; Hr'g Tr. at 23-25.) The Court, however, need not apply that test to resolve this matter.

8

process fails to create "other tangible personal property," i.e., distinct, marketable products. (See Resp't Mem. at 9-16.) Specifically, the Department maintains that no substantial transformation occurs at all because: a) Brandenburg's process is "fundamentally destructive;" and b) the metal has the same intrinsic value and specific alloy content when it is part of a structure as it has after Brandenburg processes it. (See, e.g., Resp't Mem. at 15; Resp't Reply Br. at 4-5.) Brandenburg responds, however, that its multi-step process involves far more than demolition and substantially transforms the metal debris it extracts from buildings and retired assets because the metal is not useful or valuable until its seven-step process is completed. (See, e.g., Pet'r Resp. Br. at 11-13, 19-22; Hr'g Tr. at 57-64.)

### (a) Brandenburg's process

Throughout these proceedings, the Department has characterized Brandenburg's process as a single-step demolition process. (See, e.g., Resp't Mem. at 7 ("Brandenburg's process is inextricable from the demolition of a building"); Hr'g Tr. at 4 ("Today this Court confronts the issue of whether a demolition company is engaged in exempt production when it destroys a building and sells a portion of the resultant debris").) Nonetheless, the undisputed material facts demonstrate that Brandenburg's multi-step process involves more activities than merely demolition. (See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 38-46 (stating that demolition occurs only during the second step of the process).) Additionally, Brandenburg's Equipment Utilization Report, based on time-lapsed photographs of Michigan, New York, and Tennessee jobsites and corroborated by a statistician, indicates that Brandenburg's metal processing and

9

demolition activities are distinct.[6] (See Pet'r Des'g Evid., Aff. Joseph E. Manzi, P.E. ¶¶ 6-11, Ex. A; Aff. Stanley L. Sclove, Ph.D. ¶¶ 6-8, Ex. B.) Consequently, despite Brandenburg's admission that its metal processing and demolition activities are related and "feed off of each other[,]" their interrelationship does not lead the Court to conclude that Brandenburg's seven-step process was subsumed by its demolition activities, as the Department has urged. (See Resp't Reply Br. at 3 (referring to Pet'r Des'g Evid., Jasinowski Aff. ¶ 34).)

### (b) The metal's intrinsic value and alloy content

The Department further supports its claim that Brandenburg does not make "other tangible personal property" by asserting that the designated evidence shows that the metal has the same value and alloy content both before and after Brandenburg's process. (See, e.g., Hr'g Tr. at 7-9, 14-19.) The Department first relies on the testimony of Brandenburg's secretary-treasurer, Lynn Jasinowski, stating that she established that the processing of metal does not change its value. (See Resp't Mem. at 3, 15 (citing Resp't Des'g Evid., L. Jasinowski Depo. at 57-58).) (See also Resp't Des'g Evid., L. Jasinowski Depo. at 8-9.) The designated portion of Ms. Jasinowski's deposition, however, contains information regarding only the extent of her knowledge on the types of scrap steel Brandenburg sold, how customers used the scrap steel, the general businesses of Brandenburg's customers, and its contract negotiation/bidding process. (See Resp't Des'g Evid., L. Jasinowski Depo. at 57-58.) Consequently, Ms.

---

[6] The Department has claimed the Equipment Utilization Report is not relevant because it was derived from three non-Indiana jobsites and concerns dates beyond the period at issue. (See Hr'g Tr. at 38-39.) The Report is relevant, however, to whether Brandenburg's metal processing and demolition activities are distinct regardless of their location because the parties do not dispute that Brandenburg has used the same seven-step process at all of its jobsites since 1993. (See Pet'r Des'g Evid., Aff. Jack Jasinowski ("Jasinowski Aff.") ¶ 38.)

10

Jasinowski's deposition does not provide any information about the metal's value or support for the Department's position.

In addition, both parties rely on the testimony of a steel manufacturing industry expert, George William Knack. (See, e.g., Hr'g Tr. at 53-54, 83-84.) (See also Pet'r Des'g Evid., Aff. George William Knack ("Knack Aff.") ¶¶ 7-12.) The specifically designated portions of Mr. Knack's affidavit provide as follows:

> 37. Brandenburg's role in the first stage is essential because unprepared scrap with unidentified chemistry has no value to steel manufacturers. As detailed above in paragraphs 26 to 33, a steel manufacturer can only use clean steel scrap that meets certain specifications. The length, width, thickness, cleanness, and alloy content of steel scrap directly affect the usability of that steel scrap as a raw material. Nonconformance with any of these characteristics can render steel scrap unusable for the manufacture of the intended steel products.
>
> * * * * *
>
> 39. The published value governing the rate per ton paid for delivered scrap assumes a level of purity in its content. Scrap is a purchased commodity, similar to other raw materials used in the manufacture of raw steel. Prices per gross ton paid for various sizes and metallic contents of scrap purchased are dictated by how the scrap being purchased meets the parameters established in the applicable Scrap Specifications Circular.[7] Market prices paid for various types of purchased scrap that comply with the applicable Scrap Specifications Circular are issued monthly in two publications. These two publications are "Iron Age" and "American Metal Market". To the best of my knowledge, during [the period at issue] no steel manufacturer intentionally purchased scrap that was unprepared or had an unknown chemistry. Scrap is a commodity, similar to other purchased raw material, which is paid for by weight when delivered to the steel maker.
>
> 40. A significant quantity of purchased scrap is "obsolete,"

---

[7] The Institute of Scrap Recycling Industries, Inc.'s ("ISRI") annual published guidelines, the Scrap Specifications Circular, provide buyers and sellers of various commodities with internationally accepted, standardized specifications for the quality and composition of various scrap metals. (See Pet'r Des'g Evid., Jasinowski Aff. ¶ 56; Aff. George William Knack ¶¶ 21-25, Ex. B at 4354, Ex. C at 4407, Ex. D at 4464.)

meaning that it had a previous life as part of a building, bridge, road, or other structure. Contaminants such as brick, cement, wood, and drywall, if delivered with the scrap, would add excess weight to a scrap shipment and make it impossible to establish a fair weight on which to base payment for the scrap.

41. Further, during [the period at issue], new steel manufacturers did not have the capacity or the economic desire to perform the work necessary to generate an acceptable scrap product. Instead, steel manufacturers relied upon third party companies such as Brandenburg, which is ISO 9001 certified,[8] to perform these tasks and ultimately supply processed scrap steel in accordance with [the Institute of Scrap Recycling Industries, Inc.'s ("ISRI")] guidelines. In fact, it was a requirement for companies such as US Steel that any scrap purchased conform to ISRI guidelines and be from an ISO 9001 certified or equivalent company.

(See Hr'g Tr. at 53-54, 83-84 and Pet'r Resp. Br. at 11 (citing Pet'r Des'g Evid., Knack Aff. ¶¶ 37, 39-41) (footnotes added).) Collectively, this testimony does not support the Department's position that Brandenburg does not produce a new product, but merely releases the intrinsic value of the extracted metal. Instead, as Brandenburg claims, this expert testimony explains that the extracted metal is obsolete, valueless, and unmarketable until Brandenburg transforms it into the end product Brandenburg markets -- scrap steel. Accordingly, the Court not only finds that the designated evidence fails to support the Department's claim that Brandenburg's process does not transform the metal's value, but also finds that there is no genuine issue of material fact that Brandenburg's process substantially transforms the metal from obsolete, valueless, and unmarketable debris into newly marketable scrap steel.

Finally, the Department has asserted that Brandenburg has not met its burden to

---

8   While the International Organization for Standardization ("ISO") publishes guidelines to standardize certain practices within the steel manufacturing industry, it does not determine whether a company is ISO compliant (i.e., ISO-certified). (See Pet'r Des'g Evid., Jasinowski Aff. ¶¶ 48-50.) Instead, a third party company issues the certification after auditing and reviewing an applicant company's practices and procedures. (See Pet'r Des'g Evid., Jasinowski Aff. ¶ 50.)

show that it produces a new or distinct product because the price of the scrap steel, whether encased in cement or not, is solely dictated by its weight and alloy content. (See, e.g., Hr'g Tr. at 23-25, 32-36, 82-86.)  The fact that the price of scrap metal is based on certain immutable characteristics such as its weight or alloy content does not mean, however, that encumbered metal and unencumbered metal are identical.  To focus just on weight and alloy content as the sole measure of whether raw materials are substantially transformed would ignore other evidence of transformation.  Logic dictates that a copper wire encased within a cement block is different from a copper wire without the encumbrance of debris, that sorted metal is different from unsorted metal, and that long lengths of metal are different from shorter, cut lengths of metal. Court precedent has recognized these logical conclusions finding that the measure of whether a process transforms property inputs into other tangible personal property is whether a taxpayer's integrated production process yields a product that enters the marketplace.  See, e.g., Harlan Sprague Dawley, 605 N.E.2d 1227-29 (distinguishing between rats based on their marketability); White River Envtl. P'ship v. Dep't of State Revenue, 694 N.E.2d 1248, 1251-52 (Ind. Tax Ct. 1998) (denying an exemption not because water inputs resulted in water outputs, but because the water outputs were not sold); Rotation Prods., 690 N.E.2d at 802-03 (exempting items used to remanufacture roller bearings because the repaired roller bearings were marketable).  Brandenburg's designated evidence demonstrates that its seven-step process transformed non-marketable metal into marketable scrap steel that it sold.  See supra pp. 3, 9-12. Therefore, the Court finds that Brandenburg produced scrap steel and is thereby entitled to the Equipment and Consumption Exemptions during the period at issue.

13

**CONCLUSION**

When, as here, all of the reasonable inferences arising from the undisputed material facts lead to but one conclusion, the Court may grant summary judgment to either party on the issues raised in the motion.  See, e.g., Popovich v. Indiana Dep't of State Revenue, 52 N.E.3d 73, 77-78 (Ind. Tax Ct. 2016).  Accordingly, the Court GRANTS partial summary judgment to Brandenburg.  The Court will direct the parties regarding all other remaining matters by separate cover.

SO ORDERED this 10th day of August 2016.


Martha Blood Wentworth, Judge
Indiana Tax Court