**INDIANA DEPARTMENT OF REVENUE, Appellant (Defendant below),**

v.

**INTERSTATE WAREHOUSING, INC., Appellee (Plaintiff below).**

No. 49S10–0205–TA–00266.

Supreme Court of Indiana.

Feb. 14, 2003.

Steve Carter, Attorney General, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, IN, Attorney for Appellant.

Craig R. Finlayson, Swift & Finlayson, Fort Wayne, IN, Attorneys for Appellee.

## ON PETITION FOR REVIEW

SULLIVAN, Justice.

Interstate Warehousing, Inc., uses electricity to liquify ammonia that is then used to chill warehouse space that Interstate rents to customers to store perishables. Interstate seeks to avoid the taxes due on its electricity purchases. We find that Interstate does not qualify for the statutory tax exemption it seeks because Interstate's use of the ammonia does not constitute the "production of other tangible personal

property" and because Interstate is not in the "business of . . . processing."

## Background

Interstate Warehousing, Inc. ("Interstate"), is an Indiana corporation that operates two refrigerated warehouse facilities, located in Indianapolis and Lafayette. *Interstate Warehousing, Inc. v. Indiana Dep't of State Revenue*, 764 N.E.2d 313, 314 (Ind. Tax Ct.2002), *review granted*, 2002 Ind. LEXIS 351 (Ind. May 3, 2002). Food manufacturers and retailers of frozen agricultural goods deliver to and store frozen and agricultural goods in Interstate's warehouses. *Id.*

Interstate cools the air in its storage facilities by chilling ammonia to negative 20 degrees Fahrenheit using processes involving electrical energy. *Id.* This converts the ammonia from gas form to a liquid. *Id.* The liquid ammonia is then circulated through a closed loop distribution system to lower the temperature of the air in the storage rooms. *Id.* When the temperature of the chilled refrigerant ammonia rises to zero degrees, it is returned through the same closed loop distribution system to the compressors and condensers of the central refrigeration system. *Id.* Upon receiving the warmed ammonia, Interstate again cools it and recirculates it through the closed loop system. *Id.*

Interstate charges its customers based on the temperature that is required to be maintained in the refrigerated storage area and the quantity of perishables that the customer delivers. *Id.*

From 1993 to 1996, Interstate paid sales and use taxes totaling $91,566.85 for electricity purchased for its Indianapolis and Lafayette facilities. Claiming that these electricity purchases were exempt from sales and use tax, Interstate sought a refund. The Department of State Revenue ("Department") denied Interstate's refund claim. Interstate appealed and the Indiana Tax Court held that Interstate was entitled to the refund of sales and use tax it sought. *Interstate Warehousing, Inc.*, 764 N.E.2d at 317.

## Discussion

The Indiana General Assembly has imposed excise taxes, known as the "state gross retail tax" and the "use tax," on retail transactions. Ind.Code §§ 6–2.5–2–1 and 6–2.5–3–2 (1993).[1] However, the Legislature has provided an exemption from these taxes for purchases that meet the following requirements:

> Transactions involving tangible personal property are exempt from the state gross retail tax if the person acquiring the property acquires it for direct consumption as a material to be consumed in the direct production of other tangible personal property in the person's business of manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture. This exemption includes transactions involving acquisitions of tangible personal property used in commercial printing as described in IC 6–2.1–2–4.

Ind.Code § 6–2.5–5–5.1(b). "Tangible personal property" is defined to include "electrical energy." *Id.* at § 5.1(a). Interstate claims that the electricity it purchases is required for purposes that qualify it for this exemption and, as such, is entitled to a refund of sales and use taxes paid.

---

1. The language of the statutory provisions relevant to this case remained unchanged throughout the tax years in question.

It is well established that exemption statutes are strictly construed against a taxpayer so long as the intent and purpose of the Legislature is not thwarted. *Indiana Dep't of State Revenue v. Fort Wayne Nat'l Corp.*, 649 N.E.2d 109, 113 (Ind.1995); *Monarch Steel Co. v. State Bd. of Tax Comm'rs*, 699 N.E.2d 809, 810 (Ind. Tax Ct.1998). As such, Interstate had the burden of establishing its entitlement to the exemption. *Indiana Dep't of State Revenue v. Hardware Wholesalers, Inc.*, 622 N.E.2d 930, 933–34 (Ind.1993); *Sony Music Entertainment, Inc. v. Indiana State Bd. of Tax Comm'rs*, 681 N.E.2d 800, 801 (Ind. Tax Ct.1997), *review denied*, 690 N.E.2d 1182.

We hold that Interstate has failed to demonstrate that it qualifies for the exemption here in two respects: (1) we do not find that Interstate is engaged in the "production of other tangible personal property"; and (2) we do not find that Interstate is in the business of "manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture." As the language of the statute makes clear, it must satisfy both these requirements to qualify for the exemption.

## I

Beginning with the first of these two requirements—the production of other tangible personal property—we reiterate that Interstate uses electricity to cool gaseous ammonia to liquid form and then circulates the liquid through its warehouse facilities to cool the air. When the temperature of the ammonia begins to rise, it is again chilled. The ammonia stays in the refrigeration system in what the parties refer to as a "closed loop." While it is certainly true that there is some transformation of the ammonia from gas to liquid form as a consequence of the consumption of electricity, such transformation alone is not sufficient to constitute "production of other tangible personal property" under the statute. By "production of other tangible personal property," the Legislature meant that the taxpayer must use the electricity to transform the ammonia into a distinct marketable good. That does not occur here; the liquid ammonia is never marketed.

The Tax Court itself has identified the elements of "production of other tangible personal property" in a number of cases in recent years. The "distinct marketable good" requirement is illustrated by *White River Envtl. P'ship v. Department of State Revenue*, 694 N.E.2d 1248, 1252 (Ind. Tax Ct.1998). In that case, the taxpayer, an operator of a wastewater treatment facility, claimed the exemption at issue here for the sales and use taxes it paid on chemicals and materials consumed during its treatment process. The Tax Court correctly concluded that byproducts generated by the treatment process—clean water, ash and sludge—were not part of a production process "because the 'products' of [the taxpayer's] treatment process do not satisfy any market...." *Id.*

The element of "transformation" is illustrated by *Mechanics Laundry & Supply, Inc. v. Indiana Dep't of State Revenue*, 650 N.E.2d 1223, 1231 (Ind. Tax Ct.1995), and by *Faris Mailing, Inc. v. Indiana Dep't of State Revenue*, 512 N.E.2d 480, 483 (Ind. Tax Ct.1987). In *Mechanics Laundry*, the taxpayer, an operator of a commercial laundry, claimed the exemption at issue here for the sales and use taxes it paid on cleaning supplies, water, gas, electricity, and other products consumed during the laundering of soiled textiles. The Tax Court correctly concluded that the laundering of soiled textiles did not constitute "production." *Id.* at 1229. The taxpayer was not engaged "in an over-

all process directed to the production of textiles;" instead, it was "perpetuat[ing] textiles that were produced by others." *Id.* at 1229–30.

In *Faris Mailing,* the taxpayer, a business that processed and prepared mailing items for customers, claimed the exemption at issue here for sales and use taxes it paid on labels, directories and other similar items. The Tax Court correctly concluded that the taxpayer was not engaged in the "production of other tangible personal property." According to the Tax Court, "[t]he items used in [the taxpayer's direct mail assembly] process cannot reasonably be assumed to transform the customer's package into a new product." *Id.*

One final example is particularly helpful. In *Indianapolis Fruit Co. v. Department of State Revenue,* 691 N.E.2d 1379, 1383 (Ind. Tax Ct.1998), the taxpayer, a wholesaler of fruits and vegetables, claimed that it was engaged in "production" (under different exemptions than the one at issue here) for sales and use taxes it paid on its banana and tomato ripening equipment. The Tax Court noted that the taxpayer actively ripened the bananas by introducing ethylene gas into the banana ripening booth but allowed the tomatoes to ripen by merely placing them in a tomato process-

ing unit. *Id.* at 1382, 1385–86. The court held that the taxpayer was engaged in production with respect to the bananas because the taxpayer had physically and chemically transformed the bananas from unmarketable bananas to marketable ones. *Id.* at 1381, 1385. The Court, however, found that the taxpayer's tomato ripening process did not constitute production because the taxpayer did not trigger the ripening process but merely passively allowed it to occur. *Id.* at 1381, 1385–86.

The common thread in all of these cases is that where the taxpayer did not transform property into a distinct marketable product for customer consumption, the Tax Court held that the taxpayer was not engaged in the "production of other tangible personal property." We agree with the Tax Court's analysis in those cases. Applying the same analysis to the facts here, we find that Interstate's liquification of ammonia within the "closed loop" of its warehouses' refrigeration systems may meet the transformation requirement but, because the liquefied ammonia is not purchased by Interstate's Warehouse customers, the "distinct marketable good" requirement is not met. Interstate is not engaged in the "production of other tangible personal property." [2]

2. In addition to ascertaining whether a taxpayer's product satisfies any market, the Tax Court has in other cases (but not this one) examined whether the taxation of particular transactions results in the "evil" of "tax pyramiding." *See Rotation Products Corp. v. Dep't of State Revenue,* 690 N.E.2d 795, 799 (Ind. Tax Ct.1998); *Harlan Sprague Dawley, Inc. v. Ind. Dep't of State Revenue,* 605 N.E.2d 1222, 1228 (Ind. Tax Ct.1992); *General Motors Corp. v. Ind. Dep't of State Revenue,* 578 N.E.2d 399, 405 (Ind. Tax Ct.1991). When it uses this language, the Tax Court is referring to a series of transactions where a taxpayer pays sales or use tax on property it uses in production and then passes along the added costs to its customers who then pay sales tax on their purchases—a "tax upon a tax."

While we believe that value judgments as to whether a particular taxation scheme constitutes "pyramiding" or is "evil" are best left to the legislative arena, we do think the Tax Court is probably right in its suggestion that there is certain economic activity that the Legislature only wants to tax once and that is at the point of final retail sale. *See Welsh v. Sells,* 244 Ind. 423, 434–35, 192 N.E.2d 753, 759 (Ind.1963) (quoting Current Studies of Ind. Tax Policy, The Retail Sales Tax, Ind. Comm'n. On St. Tax & Financing Policy First Report—1962, page 11). We think an inescapable corollary of this principle, however, is that there be a point of final sale. That is, one of the reasons the exemption was not available in the White River case—and is not available in this one—is that there is no prod-

## II

■ A second requirement of the exemption at issue here is that the taxpayer's business be "manufacturing, processing, refining," or one of the other businesses listed in the statute. Interstate contends that it meets this requirement because it is engaged in "processing." Pet'r's Mem. In Supp. Of Mot. For Summ. J. ("Pet'r's Mem."), Appendix at 96. The Indiana Administrative Code defines "processing" for these purposes as follows:

> Processing or refining is defined as the performance by a business of an integrated series of operations which places tangible personal property in a form, composition, or character different from that in which it was acquired. The change in form, composition, or character must be a substantial change. Operations such as distilling, brewing, pasteurizing, electroplating, galvanizing, anodizing, impregnating, cooking, heat treating, and slaughtering of animals for meat or meal products are illustrative of the types of operations which constitute processing or refining, although any operation which has such a result may be processing or refining. A processed or refined end product, however, must be substantially different from the component materials used.

Ind. Admin. Code tit. 45 r. 2.2–5–10(k). Interstate argues that it is engaged in processing because it processes chilled ammonia to produce conditioned air and sells "the cooled, dehydrated and conditioned air that it processes." Pet'r's Mem., App. at 90. But we think the Department has the better part of the argument: "Interstate [does not] 'perform an integrated series of operations' resulting in a transformed end product to Interstate's customer. . . . The cool air merely maintains the

customer's previously manufactured goods. There is no substantial change in 'form, composition, or character' to those goods. The cold air is only incidental to the service of storing previously manufactured goods." Mem. in Supp. of Resp. to Mot. For Summ. J. and Cross–Mot. For Summ. J., App. at 76. We hold that Interstate is not engaged in the "business of . . . processing."

## III

In deciding this case in favor of Interstate, the Tax Court relied heavily on its opinion in *Mid–America Energy Resources, Inc. v. Indiana Dept. of State Revenue*, 681 N.E.2d 259 (Ind. Tax Ct.1997), *review denied*, 690 N.E.2d 1184. Because of this emphasis, we believe we should explain why we read *Mid–America* differently.

The taxpayer in Mid–America was an Indiana corporation that provided chilled water for air conditioning to downtown Indianapolis businesses. *Mid–America*, 681 N.E.2d at 260. Mid–America operated a central processing plant where it chilled and chemically treated water before distributing the water to its customers through an underground, closed loop, distribution system. *Id.* When the water became too warm to serve its purpose, it was returned to the central plant through the closed loop and the process was repeated. *Id.* Mid–America charged its customers based on the quantity of water delivered and the temperature differences in the water that returned. *Id.* It collected sales tax on the sales made, remitting sales taxes collected from non-exempt customers to the appropriate authorities. *Id.*

The Tax Court correctly found that Mid–America was entitled to the exemption at issue in this case on chemicals it

uct on which the taxpayer's customer pays sales or use tax.

purchased because its operation of chilling and treating water for the purpose of conditioning air in its customers' buildings constituted production of other tangible personal property. *Id.* at 264. Mid–America chilled and treated water that its customers purchased and used to condition the air in their respective buildings.

In its opinion in this case, the Tax Court compared the factual background of *Mid–America* but focused only on the chilling processes used by the respective companies. Certainly, Interstate's process for chilling and distributing ammonia is similar to the process Mid–America used for the cooling and distribution of water. We also agree with the Tax Court that both companies distributed their coolants through a closed loop system with similar types of machinery. *See Interstate Warehousing, Inc.,* 764 N.E.2d at 316–317.

However, as discussed in Part I, *supra,* we conclude that the Tax Court failed to apply the "distinct marketable good" requirement. Interstate primarily provides the service of storing frozen goods. A necessary component of this service is a climate-controlled environment. Interstate's customers did not purchase the processed ammonia—just like *White River*'s customers did not purchase distinct marketable products. In contrast, Mid–America's customers bought—and paid sales tax on—a distinct marketable product: chilled water. The process Interstate uses to achieve an air conditioned environment is incidental to the service of providing storage for frozen goods. Its customers are neither purchasing, nor paying sales or use taxes on the goods used to provide the service.

## IV

Interstate also claimed exemption from sales and use tax on its energy purchases under Ind.Code § 6–2.5–4–5. This exemption applies to certain purchases of "power" (defined as "electrical energy, natural or artificial gas, water, steam, or steam heating"). *Id.* The Tax Court, finding that Interstate was entitled to the exemption discussed above, declined to reach this issue. *Interstate Warehousing,* 764 N.E.2d at 314, n. 1. It is not clear to us that Interstate sought a refund on this basis. *See* Order Denying Refund, App. at 122–23. In any event, we note that for Interstate to be eligible for this exemption, it would be required to purchase power for use in the "production" of "tangible personal property." We have already determined that Interstate is not engaged in the production of tangible personal property.

### Conclusion

We reverse the judgment of the Indiana Tax Court and affirm the decision of the Indiana Department of Revenue denying Interstate exemption from sales and use tax under Ind.Code § 6–2.5–5–5.1 in this case.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.