ATTORNEYS FOR PETITIONER:
**DONALD F. FOLEY**
**TONY H. ABBOTT**
FOLEY & ABBOTT
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**EVAN W. BARTEL**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

FILED
Jan 11 2017, 1:44 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| MERCHANDISE WAREHOUSE CO., INC., ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Cause No. 49T10-1302-TA-00009 |
| ) | |
| INDIANA DEPARTMENT OF ) | |
| STATE REVENUE, ) | |
| ) | |
| Respondent. ) | |

## ORDER ON RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

**FOR PUBLICATION**
**January 11, 2017**

WENTWORTH, J.

Between October 2009 and September 2012 (the period at issue), Merchandise Warehouse Co., Inc. purchased certain freezer equipment and electricity to power its freezer equipment. Upon review, the Court finds that those retail transactions were not exempt from Indiana sales tax under Indiana Code § 6-2.5-5-3 and Indiana Code § 6-2.5-5-5.1.

**FACTS AND PROCEDURAL HISTORY**

Merchandise Warehouse, an Indiana corporation, operates a food storage warehouse in Indianapolis, Indiana. Merchandise Warehouse's customers are food manufacturers that deliver to, and store, their products in Merchandise Warehouse's facility. Their food products – meats, vegetables, and soups specifically prepared for businesses like Panera, Chili's, and Wendy's – arrive at Merchandise Warehouse's facility already packaged and on pallets. (First Jt. Stip. Facts, Ex. 5 at 14-15, 17, 19-20, 22-23; Second Jt. Stip. Facts ¶¶ 17, 19, Ex. 23 at 8.) Upon arrival, the food products are either at room temperature, chilled, or even frozen. (See Second Jt. Stip. Facts ¶¶ 11, 20.)

Because some of Merchandise Warehouse's customers want their room-temperature or chilled food products stored in a frozen state, Merchandise Warehouse provides them with either "slow" or "blast" freezing services. (See, e.g., First Jt. Stip. Facts, Ex. 5 at 7; Second Jt. Stip. Facts ¶ 21.) With slow freezing, Merchandise Warehouse simply places its customers' pallets of food products in a freezer to freeze at their own pace, typically five to twelve days. (First Jt. Stip. Facts, Ex. 5 at 7; Second Jt. Stip. Facts ¶ 11.) With blast freezing, however, Merchandise Warehouse uses specialized equipment to freeze the pallets of food products within two days.[1] (Second Jt. Stip. Facts ¶¶ 12, 14, 25.) Either way, the food products are frozen to prolong their

---

[1] Blast freezing freezes food products by forcing air around the sides of the pallet on which they are placed, as well as between the pallets' layers. (See Second Jt. Stip. Facts ¶ 14(iv).) Because blast freezing employs a specialized type of equipment, it is more costly than slow freezing. (See Second Jt. Stip. Facts, Ex. 23 at 31-32.) There are fewer negative metabolic changes in food that has been blast frozen as opposed to food that has been frozen slowly. (See, e.g., First Jt. Stip. Facts, Ex. 6 ¶ 11.)

shelf-life. (See First Jt. Stip. Facts, Ex. 5 at 7 (indicating that Merchandise Warehouse's customers have a longer amount of time to store and then ship the food products when frozen); Second Jt. Stip. Facts ¶¶ 15-16.)

Merchandise Warehouse stores the frozen food products until its customers release them to their own customers or their designated common-carriers. (See Second Jt. Stip. Facts ¶¶ 23, 26-27, 29-30.) The frozen products leave Merchandise Warehouse's facility on the same pallets upon which they arrived. (Second Jt. Stip. Facts ¶ 27.) Merchandise Warehouse never takes title to its customers' food products. (Second Jt. Stip. Facts ¶ 18.) Merchandise Warehouse bills its customers for the storage space and any freezing incident to that storage. (See, e.g., First Jt. Stip. Facts, Exs. 5 at 9-10, 6 at 6.)

In 2011 and 2012, Merchandise Warehouse filed two Forms ST-200 ("Utility Sales Tax Exemption Applications") and three Forms GA-110L ("Claims for Refund") with the Department covering the period at issue. (See First Jt. Stip. Facts ¶¶ 3, 8, 19, Exs. 1, 5, 12.) In those Forms, Merchandise Warehouse asserted that the electricity it purchased to operate its freezer equipment, as well as certain purchases of freezer equipment, should have been exempt from sales tax because "[t]he freezing of the food constitutes the last stage in the [food's] manufacturing process." (First Jt. Stip. Facts, Exs. 1, 5 at 4, 12 at 1.)

The Department initially denied all three of Merchandise Warehouse's Claims for Refund. (See, e.g., First Jt. Stip. Facts ¶¶ 3-13, 19-21.) After two subsequent administrative hearings, the submission of evidence, and a supplemental audit, however, the Department determined that Merchandise Warehouse was entitled to a

15% refund with respect to its electricity purchases. (See First Jt. Stip. Facts ¶¶ 11, 14-17, 21-23, Exs. 7, 9 at 3-5, 10.) The Department reaffirmed its denial of Merchandise Warehouse's claim for refund on the purchases of the freezer equipment. (See First Jt. Stip. Facts ¶ 24.)

Merchandise Warehouse timely filed an original tax appeal. The Department subsequently moved for summary judgment, claiming that Merchandise Warehouse's purchases of electricity and freezer equipment were not exempt under either Indiana Code § 6-2.5-5-5.1 or Indiana Code § 6-2.5-5-3. (See, e.g., Resp't Br. Supp. Mot. Summ. J. ("Resp't Br.") at 4; Hr'g Tr. at 6-7, 78-82.) The Court conducted a hearing on the Department's motion on October 23, 2015. Additional facts will be provided when necessary.

## STANDARD OF REVIEW

The Court reviews refund claim denials by the Department de novo. IND. CODE § 6-8.1-9-1(c) (2017). Accordingly, the Court is not bound by the evidence or the issues presented at the administrative level. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

Summary judgment is appropriate only when the designated evidence demonstrates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. See Ind. Trial Rule 56(C). "When any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party." T.R. 56(B).

4

**LAW**

Indiana imposes an excise tax, known as the state sales tax, on retail transactions made within the state. IND. CODE § 6-2.5-2-1(a) (2009). "The person who acquires property in a retail transaction is liable for the tax on the transaction[.]" I.C. § 6-2.5-2-1(b).

In an effort to encourage industrial growth and to limit the effect of tax pyramiding, the Indiana legislature has enacted several statutes that exempt from sales tax certain purchases of tangible personal property that are used or consumed in the production of other tangible personal property. See, e.g., Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue, 605 N.E.2d 1222, 1228 (Ind. Tax Ct. 1992). Two of those statutes are directly at play in this case.

The first statute is Indiana Code § 6-2.5-5-5.1. It provides that

> [t]ransactions involving [the purchase of electrical energy] are exempt from the [sales] tax if the person acquiring the [electrical energy] acquires it for direct consumption as a material to be consumed in the direct production of other tangible personal property in the person's business of manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or aboriculture.

5

IND. CODE § 6-2.5-5-5.1(a)-(b) (2009).  This exemption is known as the Consumption Exemption.[2]  See Brandenburg Indus. Serv. Co. v. Indiana Dep't of State Revenue, 60 N.E.3d 300, 303 (Ind. Tax Ct. 2016).

The second statute, Indiana Code § 6-2.5-5-3, is known as the Equipment Exemption.  See id.  It provides, in relevant part, that "transactions involving manufacturing machinery, tools, and equipment are exempt from the [sales] tax if the person acquiring that property acquires it for direct use in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property."  IND. CODE § 6-2.5-5-3(b) (2009) (amended 2015).

## ANALYSIS

The question before the Court is whether the electricity and freezer equipment Merchandise Warehouse uses to freeze its customers' food products qualifies for the Consumption and Equipment Exemptions.  In order to qualify for these exemptions, Merchandise Warehouse must:  1) be engaged in the production of other tangible personal property, and 2) use its electricity and freezer equipment as an essential and

---

[2] Merchandise Warehouse has also claimed that its purchases of electricity are not subject to sales tax pursuant to Indiana Code § 6-2.5-4-5. (See, e.g., Pet'r Am. V. Pet. Judicial Review Final Determination Indiana Dep't Revenue ("Pet'r Pet.") ¶ 3.)  That statute excludes from sales tax retail sales of electricity by a public utility to a purchaser who consumes the electricity "as an essential and integral part of an integrated process that produces tangible personal property[.]" See IND. CODE § 6-2.5-4-5(c)(3) (2009) (amended 2012). See also Alloy Custom Prods., Inc. v. Indiana Dep't of State Revenue, 26 N.E.3d 1078, 1082 n.4 (Ind. Tax Ct. 2015) (explaining the difference between an exclusion and an exemption).  As this Court has previously explained, however, the exemption under Indiana Code § 6-2.5-5-5.1 and the exclusion under Indiana Code § 6-2.5-4-5 are integrally related to each other:  "a taxpayer's qualification for the [exclusion] depends on its qualification for the [exemption]." Aztec Partners, LLC v. Indiana Dep't of State Revenue, 35 N.E.3d 320, 328 (Ind. Tax Ct. 2015) (citing 45 IND. ADMIN. CODE 2.2-4-13(b) (2010) (see http://www.in.gov/legislative/iac/) (providing that for purposes of the exclusion under Indiana Code § 6-2.5-4-5, "'[e]lectrical energy . . . will only be considered directly used in direct production [or] manufacturing . . . if [it] would be exempt under IC 6-2.5-5-1'")).  Thus, if the Court determines that Merchandise Warehouse is not eligible for the Consumption Exemption, it need not analyze whether Merchandise Warehouse qualifies for the exclusion contained in Indiana Code § 6-2.5-4-5.

integral part of its integrated production process. See Aztec, LLC v. Indiana Dep't of State Revenue, 35 N.E.3d 320, 324 (Ind. Tax Ct. 2015); Indiana Waste Sys. of Indiana, Inc. v. Indiana Dep't of State Revenue, 633 N.E.2d 359, 362 (Ind. Tax Ct. 1994). Merchandise Warehouse meets neither of these requirements.

**1.**

When determining the applicability of the Consumption and Equipment Exemptions, "there is one iron-clad rule: without production there can be no exemption." See Indianapolis Fruit Co. v. Dep't of State Revenue, 691 N.E.2d 1379, 1384 (Ind. Tax Ct. 1998) (citations omitted). Production is broadly defined to encompass a host of different activities and situations; thus, "whether production is occurring depends on the factual circumstances of the [particular] case." Id. at 1383-84. Nonetheless, the Indiana Supreme Court has explained that "production" focuses on the transformation of materials into a new, distinct marketable good.[3] See Indiana Dep't of Revenue v. Interstate Warehousing, Inc., 783 N.E.2d 248, 250-51 (Ind. 2003); Harlan Sprague Dawley, 605 N.E.2d at 1228 (explaining that the creation of a new, distinct marketable good means that the number of "scarce economic goods" has been increased). See also Rotation Prods. Corp. v. Dep't of State Revenue, 690 N.E.2d 795, 801 (Ind. Tax Ct. 1998) (explaining that while an activity may have an impact on the number of scarce economic goods by increasing their longevity, that activity might not actually produce scarce economic goods).

---

[3] Production has the same meaning under both the Equipment and Consumption Exemptions. See Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue, 605 N.E.2d 1222, 1226-30 (Ind. Tax Ct. 1992).

The Department claims it is entitled to judgment as a matter of law because Merchandise Warehouse is not engaged in production of other tangible personal property when it freezes its customers' food products. More specifically, it explains that the distinct marketable goods in this case – the food products – have already been created by Merchandise Warehouse's customers. (See Resp't Br. at 4, 6-7.) The Department maintains that Merchandise Warehouse merely performs a service upon those already-created, distinct marketable goods (i.e., by freezing them) in order to prolong their shelf-lives. (See Resp't Br. at 7.) Merchandise Warehouse responds, however, that it is engaged in production because when it freezes the food products, it does create new, distinct marketable goods: once frozen, the food products have a longer period by which they can be marketed and their quality has been preserved. (See Pet'r Resp. Resp't Mot. Summ. J. & Request J. Entered Pet'r ("Pet'r Br.") at 9-10.)

There is a physical transformation when food products are frozen. That transformation, however, is not enough to carry the day for Merchandise Warehouse because it has not created any "distinct marketable goods." Indeed, when it provides its freezing services, Merchandise Warehouse is engaged in an activity that, while transformative, simply preserves the food products that have already been prepared and packaged by its customers. (See Second Jt. Stip. Facts, Ex. 23 at 8 (stating that Merchandise Warehouse's customers "want to make food; they don't want to handle the warehousing").) This activity is not contemplated as production. See, e.g., Mechanics Laundry & Supply, Inc. v. Indiana Dep't of State Revenue, 650 N.E.2d 1223, 1229-31 (Ind. Tax Ct. 1995) (holding that producing goods is entirely different than perpetuating goods that were already produced by someone else); Faris Mailing, Inc. v. Indiana Dep't

8

of State Revenue, 512 N.E.2d 480, 483 (Ind. Tax Ct. 1987) (holding that a taxpayer who combined its customers' products into a package did not transform them into new, distinct, marketable goods). Moreover, Merchandise Warehouse's freezing activity does not increase the number of scarce economic goods present in the marketplace because even though its services extend shelf-life and geographic availability, the same number of food products are available to be sold by Merchandise Warehouse's customers regardless of whether they are frozen. (See, e.g., First Jt. Stip. Facts, Exs. 5 at 9-10, 6 at 6 (indicating that the only thing Merchandise Warehouse sells is storage space and any freezing services incident to that storage); Second Jt. Stip. Facts ¶¶ 17-19 (establishing that Merchandise Warehouse never takes title to its customers' food products and that its customers' food products are marketable before they are frozen); Hr'g Tr. at 61, 64 (where Merchandise Warehouse acknowledges that freezing the food products simply allows them to be sold to customers farther away).)

Merchandise Warehouse's freezing services do not culminate in the production of new, distinct marketable goods. Accordingly, its purchases of electricity and freezer equipment do not qualify for the Consumption and Equipment Exemptions.

**2.**

The Department's regulations state that production "begins at the point of the first operation or activity constituting part of the integrated production process and ends at the point that the production has altered the item to its completed form, including packaging, if required." 45 IND. ADMIN. CODE 2.2–5–8(d) (2009) (see http://www.in.gov/legislative/iac/). Moreover, this Court has stated that "[t]he end of an integrated production process is not signaled by the production of unfinished work in

9

process merely because it is potentially a finished marketable product. An integrated production process terminates upon the production of the most marketable finished product, e.g., the product actually marketed." General Motors Corp. v. Indiana Dep't of State Revenue, 578 N.E.2d 399, 404 (Ind. Tax Ct.1991), aff'd, 599 N.E.2d 588 (Ind. 1992). Accordingly, Merchandise Warehouse argues that because the food products that are actually marketed are frozen, its use of its electricity and freezer equipment purchases is essential and integral to the overall integrated production process. Indeed:

> had [its customers] completed the freezing of [their] perishable foods at one of [their] own plants, there were would be no question that such freezing, be it blast or slow freezing, would be included as a part of the manufacturing process. . . . As such, Merchandise [Warehouse] has been engaged in the final step of [its customers'] integrated production process[.]

(Pet'r Br. at 10.) Merchandise Warehouse's argument, however, ignores one salient point: both the Consumption and Equipment Exemptions employ a "double direct" standard. See I.C. §§ 6-2.5-5-3, -5.1. As this Court has previously explained, the minimum threshold requirement of the double direct standard is that the taxpayer who purchases the electricity or equipment in question must use those purchased items as part of its own process to produce other tangible personal property, "not as part of an

10

alleged process of another taxpayer." See Indiana Waste Sys., 633 N.E.2d at 362-63.[4]

See also Interstate Warehousing, 783 N.E.2d at 252.

## CONCLUSION

Merchandise Warehouse does not produce other tangible personal property in an integrated production process when it freezes its customers' food products. Accordingly, the Court GRANTS summary judgment in favor of the Department and AGAINST Merchandise Warehouse.[5]

SO ORDERED this 11th day of January 2017.

_____
Martha Blood Wentworth, Judge
Indiana Tax Court

DISTRIBUTION:

Donald F. Foley, Tony H. Abbott, Evan W. Bartel

---

[4] The version of the Equipment Exemption at issue in Indiana Waste Systems read that "[t]ransactions involving manufacturing machinery, tools, and equipment are exempt from the state gross retail tax if the person acquiring that property acquires it for his direct use in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property." See Indiana Waste Sys. of Indiana, Inc. v. Indiana Dep't of State Revenue, 633 N.E.2d 359, 362 (Ind. Tax Ct. 1994). While the word "his" has since been eliminated from the statute, the Court does not find that the word's removal changes the minimum threshold requirement of the double direct standard (i.e., that the taxpayer claiming the exemption uses the purchased items in its own process and not as part of another's).

[5] The Court notes that the Department relied on Indiana Code § 6-2.5-4-2(c) when, during the administrative process, it awarded Merchandise Warehouse the 15% refund with respect to its electricity purchases. See supra p.3. (See also First Jt. Stip. Facts, Exs. 7 at 3-4, 9 at 3-4.) Because this opinion only addresses the applicability of Indiana Code § 6-2.5-5-3 and Indiana Code § 6-2.5-5-5.1, it does not address the applicability of Indiana Code § 6-2.5-4-2(c) as raised by Merchandise Warehouse in its original tax appeal. (See Pet'r Pet. ¶ 3.)