ATTORNEYS FOR PETITIONER
Donald F. Foley
Tony H. Abbott
David S. Klinestiver
Foley & Abbott
Indianapolis, Indiana

ATTORNEY FOR AMICI CURIAE
GLOBAL COLD CHAIN ALLIANCE &
PARK 100 FOODS, INC.
Bryan H. Babb
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR RESPONDENT
Curtis T. Hill, Jr.
Indiana Attorney General

Evan W. Bartel
Patricia C. McMath
Deputy Attorneys General
Indianapolis, Indiana



FILED

Dec 13 2017, 12:17 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

# In the
# Indiana Supreme Court

_____

No. 49S10-1712-TA-735

MERCHANDISE
WAREHOUSE CO., INC.,

*Petitioner,*

v.

INDIANA DEPARTMENT OF
STATE REVENUE

*Respondent.*

_____

On Petition for Review from the Indiana Tax Court, No. 49T10-1302-TA-09
The Honorable Martha Blood Wentworth, Judge

_____

**December 13, 2017**

**Goff, Justice.**

Petitioner submitted refund claims to the Department of State Revenue for sales tax paid on blast freezing equipment and the electricity used in operating said equipment. The Department partially denied the refunds and the Tax Court affirmed, holding that the Petitioner did not engage in "direct production" and, therefore, could not qualify for exemptions under the relevant statutes. We grant review and reverse.

**Factual and Procedural History**

The parties stipulated to the following facts. Merchandise Warehouse Company, Inc., ("MWC") operates a freezing and storage facility in Indianapolis, Indiana. MWC's customers ("Depositors") prepare perishable food products like meat, bread, vegetables, chili, or soup at their facilities and then transport the products to MWC for freezing and storage before releasing them to their own customers or common carriers. MWC offers two freezing options—slow or blast freezing—and Depositors may contract for either freezing method for their products.

Depositors send their food products to MWC stacked on pallets. The food arrives in varying temperatures. Upon arrival, MWC takes the internal temperature of the food on each pallet.

If a Depositor designates a product for slow freezing, then MWC places those pallets in the freezer storage area. Depending upon various factors, slow freezing may take five to twelve days. Slow freezing food products increases metabolic changes that may negatively affect the food's quality and shelf-life.

If a Depositor designates a product for blast freezing, then MWC places those pallets in its completely separate blast freezing area in order to utilize its Quick Freeze Refrigeration ("QFR") system. MWC began using the QFR system for blast freezing in October 2011. From 2008 to October 2011, MWC conducted blast freezing in the same freezer storage area where it placed food products for slow freezing. MWC then accomplished blast freezing by placing large industrial fans next to the designated pallets of food. This blast freezing process took four to six days to complete.

2

Since that time, MWC has made a significant investment in its QFR system to expedite the blast freezing process. MWC's new, and greatly improved, QFR consists of 660 individual blast cells, three pallet slots high. To blast freeze a product, MWC places the pallet in one individual blast cell. The cell forces air on multiple sides of the pallet through spacers that separate each layer of food. The pallet remains in the individual cell until MWC verifies the food has been frozen to an internal temperature of zero degrees Fahrenheit. Using this QFR system, MWC can blast freeze products in forty-eight hours. Unlike slow freezing, blast freezing extends product shelf life.

Once a food product is blast frozen, MWC shrink wraps the pallets in accordance with the Depositor's contract. The shrink-wrapped, blast-frozen pallets are then placed in storage racks in the freezer area where they may remain for two to twenty-nine days, until the Depositor releases them. MWC bills Depositors based on the freezing method required by the contract and the storage space used.

In 2011 and 2012, MWC filed two Forms ST-200 ("Utility Sales Tax Exemption Applications") and three Forms GA-110L ("Claims for Refund") with the Indiana Department of State Revenue ("the Department"), seeking refunds for sales tax paid on electricity and equipment used during the freezing process. Citing the industrial exemptions found at Indiana Code sections 6-2.5-5-5.1(b) and 6-2.5-5-3, MWC asserted the electricity and equipment it used during blast freezing should be exempt from sales tax because "[t]he freezing of the food constitutes the last stage in the [food's] manufacturing process." The Department denied MWC's refund claims, concluding that MWC "does not manufacture tangible personal property for sale but rather provides a service."

MWC timely protested those denials, but after administrative hearings in which MWC presented evidence and argument, the Department denied the protest in part and sustained it in part, pending a supplemental audit. Following the audit, the Department granted MWC a 15% refund for the electricity purchased and used during the freezing stages, but it denied any refund for the freezing equipment.

MWC filed a verified petition for judicial review in the Indiana Tax Court, appealing the Department's determinations that MWC did not use the specified electricity or equipment for manufacturing or production. The Department moved for summary judgment, arguing that MWC's relevant electricity and equipment purchases did not qualify for exemptions under Indiana Code

3

sections 6-2.5-5-5.1(b) and 6-2.5-5-3 as a matter of law. In response, pursuant to Indiana Trial Rule 56(B), MWC also requested summary judgment, arguing that the same statutory language, as applied to these facts, entitled it to the requested relief as a matter of law.

The Tax Court granted the Department summary judgment, finding that MWC's "retail transactions were not exempt from Indiana sales tax under Indiana Code [sections] 6-2.5-5-3 and … 6-2.5-5-5.1." Merchandise Warehouse Co., Inc. v. Ind. Dep't. of State Revenue, 67 N.E.3d 666, 667 (Ind. Tax Ct. 2017). Specifically, the Court determined that MWC's "freezing services do not culminate in the production of new, distinct marketable goods. Accordingly, its purchase of electricity and freezer equipment do not qualify for the . . . [e]xemptions." Id. at 671. The Tax Court went on to explain that a "taxpayer who purchases the electricity or equipment in question must use those purchased items as part of its *own* process to produce other tangible personal property." Id. at 672.

MWC petitioned this Court for review, raising two issues relating to the industrial exemptions: (1) whether MWC engages in "production" when it blast freezes another company's food product; and (2) whether MWC must be engaged in its own production process. We now grant review and reverse.

**Standard of Review**

Summary judgment is appropriate only when the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Hughley v. State, 15 N.E.3d 1000, 1003 (Ind. 2014). Although this Court ordinarily reviews summary judgment orders de novo, we take a "limited departure" when reviewing summary judgments entered by the Tax Court. Ind. Dep't. of State Revenue v. Caylor-Nickel Clinic, P.C., 587 N.E.2d 1311, 1313 (Ind. 1992). Because the Tax Court holds "specialized expertise" in tax law matters, we extend "cautious deference" to its decisions, reversing only when "we are definitely and firmly convinced that an error was made." Ind. Dep't. of Revenue v. Miller Brewing Co., 975 N.E.2d 800, 803 (Ind. 2012) (citation omitted). However, we will not defer to the Tax Court's opinion when the matter turns upon the plain meaning of an unambiguous statute since "we are in no worse position than the Tax Court to apply the statute as written." Ind. Dep't. of State Revenue v. Caterpillar, Inc., 15 N.E.3d 579, 586 (Ind. 2014).

4

**Discussion and Decision**

Indiana imposes an excise tax—i.e., a sales tax—on retail transactions made within the state. Ind. Code § 6-2.5-2-1(a) (2006 Repl.). "The person who acquires property in a retail transaction is liable for the tax …." I.C. § 6-2.5-2-1(b). But in efforts to promote industrial growth and prevent tax pyramiding, the General Assembly enacted statutes exempting from the sales tax those purchases "closely connected with the *production of goods*." Harlan Sprague Dawley, Inc. v. Ind. Dep't. of State Revenue, 605 N.E.2d 1222, 1228 (Ind. Tax Ct. 1992) (citation omitted); see also I.C. § 6-2.5-5 et seq. ("Exempt Transactions of Retail Merchant"). Collectively known as the "industrial exemptions," these statutes apply to "certain purchases of tangible personal property used, consumed, or incorporated into other tangible personal property." Harlan Sprague Dawley, Inc., 605 N.E.2d at 1224.

The present case involves two specific industrial exemption statutes: MWC invokes the Consumption Exemption statute when arguing that the electricity it uses during blast freezing is exempt from sales tax; and it invokes the Equipment Exemption statute when arguing that its blast freezing equipment is likewise exempt. These exemption statutes share language and requirements.

The Consumption Exemption statute provides:

> Transactions involving tangible personal property [including electrical energy] are exempt from the state [sales] tax if the person acquiring the property acquires it for direct consumption as a material to be consumed in the *direct production* of other tangible personal property in the person's business of manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture.

I.C. § 6-2.5-5-5.1(b) (emphasis added). The Equipment Exemption, in relevant part, provides:

> [T]ransactions involving manufacturing machinery, tools, and equipment are exempt from the [sales] tax if the person acquiring that property acquires it for direct use in the *direct production*, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property.

I.C. § 6-2.5-5-3(b) (Supp. 2009) (emphasis added). Reading these statutes, we see plainly that both "require that the taxpayer engage in [direct] production before qualifying for the exemption[s]." Indianapolis Fruit v. Ind. Dep't. of State Revenue, 691 N.E.2d 1379, 1383 (Ind. Tax Ct. 1998) (citations omitted). To be sure, these statutes impose "one iron-clad rule: without production there

5

can be no exemption." Id. at 1384 (citation omitted). This case, therefore, turns upon whether MWC engages in direct production when it blast freezes its customers' food products. But before we can answer that question, we must first consider what constitutes "direct production" for purposes of the industrial exemptions.

I. **Indiana law broadly defines "direct production" as a process that substantially changes tangible personal property, transforming it into a distinct marketable good.**

A. *Indiana's Administrative Code defines "direct production" as an integrated process that substantially transforms tangible personal property into a distinct product.*

Although the industrial exemption statutes require "direct production," Title 6 leaves the term undefined. The Administrative Code, however, provides the following definition:

> "*Direct production*, manufacture, fabrication, assembly, or finishing of tangible personal property" is performance as a business of an integrated series of operations which places tangible personal property in a form, composition, or character different from that in which it was acquired. The change in form, composition, or character must be a substantial change, and it must result in a transformation of property into a different product having a distinctive name, character, and use.

45 Ind. Admin. Code 2.2-5-8(k) (1988) (emphasis added). From this regulation we understand that "direct production" is a process during which tangible personal property undergoes substantial change that transforms it into a distinct product.

The Administrative Code builds upon that broad definition by further instructing that the production process can encompass all steps that alter the tangible personal property into its completed form, up to and including packaging. 45 I.A.C. 2.2-5-8(d) ("'[T]he production process' begins at the point of the first operation or activity constituting part of the integrated production process and ends at the point that the production has altered the item to its completed form, including packaging, if required."). In the same vein, the Administrative Code provides that machinery, tools, and equipment are part of the production process—and therefore exempt from sales tax under the industrial exemptions—if those items serve "an essential and integral part" in transforming the tangible personal property into a distinct product. 45 I.A.C. 2.2-5-8(c). Taken together, these provisions mean that simply being used during the production process does not make electricity or equipment exempt from sales tax, but electricity and equipment are exempt only if they prove

6

essential and integral to producing the most marketable good. See Indianapolis Fruit, 691 N.E.2d at 1384.

Notably, no party argues that the relevant industrial exemption statutes or administrative regulations are ambiguous provisions in need of judicial construction. Indeed, they even agree the statutes and regulations control here, but they part ways when applying them to these facts, turning our attention to precedent.

> B. *Indiana's case law reflects the standards outlined in the industrial exemption statutes and attendant administrative regulations.*

These administrative regulations reverberate through Indiana case law—it too defines "production" broadly, focusing on the transformative process of creating a distinct marketable good. Indianapolis Fruit, 691 N.E.2d at 1383. For example, the Tax Court instructed that "production . . . encompass[es] all the . . . steps involved in transforming work in process into a finished marketable product." General Motors Corp. v. Ind. Dep't. of State Revenue, 578 N.E.2d 399, 401 (Ind. Tax Ct. 1991). See also Ind. Dep't. of Revenue v. Interstate Warehousing, Inc., 783 N.E.2d 248, 251 (Ind. 2003) (explaining that "production" entails "transform[ing] property into a distinct marketable product for customer consumption"). To that end, the production process does not conclude when it yields a potentially marketable product, but when it yields the most marketable good—"the product actually marketed." Aztec Partners v. Ind. Dep't. of State Revenue, 35 N.E.3d 320, 325 (Ind. Tax Ct. 2015) (quoting General Motors Corp., 578 N.E.2d at 404). Our case law likewise echoes the regulations' requirement that, in order to qualify for an industrial exemption, electricity or equipment used in the production process must be essential and integral to making the distinct marketable product. Ind. Dep't. of State Revenue v. Cave Stone, Inc., 457 N.E.2d 520, 523-24 (Ind. 1983).

We find that our precedent closely tracks the statutes and regulations. We also agree with the parties that neither the industrial exemption statutes requiring "direct production" nor the administrative regulations defining that term are ambiguous. Thus, considering Indiana law comprehensively, we distill that "direct production" involves those essential and integral steps necessary to transform tangible personal property into a distinct marketable good, i.e., the good actually marketed to the consumer.

7

With the law settled, we turn now to the facts.

## II. MWC engages in "direct production" when it blast freezes its customers' food products.

Whether a taxpayer engages in "direct production"—whether it performs essential and integral steps in transforming property into a distinct marketable good—is a fact sensitive inquiry. Indianapolis Fruit, 691 N.E.2d at 1383-84. Critical to our analysis is MWC's distinct blast freezing process. Under these limited facts, blast freezing transforms the customer's product into a marketable good. By contrast, slow freezing the products merely provides the customer a means by which to warehouse those products. Accordingly, these stipulated facts show that MWC engages in direct production by blast freezing its customers' food products.

MWC's contracts with some Depositors oblige it to blast freeze certain food products. The blast freezing process requires that MWC take specific steps at precise times. Food products arrive at MWC's facility at variable temperatures (warm or chilled or frozen, but not yet blast frozen) and MWC must take the internal temperature of each pallet of food. Then MWC transports the food products to a separate, colder freezer area and places the food in blast cells that force cold air around the pallets. MWC keeps the food in that separate blast-freezing area until it verifies the food has been frozen to an internal temperature of zero degrees Fahrenheit. The slow freezing process, however, requires less specificity or precision on MWC's part. When a contract requires only slow freezing, MWC must still take the food's internal temperature, but then MWC simply places the pallets in the freezer storage area and takes no further action. Depending upon the product's internal temperature, its ingredients, and other factors, slow freezing the product takes a period of five to twelve days. The slow-frozen food remains in the freezer storage area until the Depositor releases it.

Besides expediting the freezing process, blast freezing decreases metabolic changes that occur in the food during slow freezing, increases the food's quality, and improves shelf-life. And so customers will sometimes require blast freezing as opposed to slow freezing. Blast freezing, therefore, creates a distinct product—a good that is actually marketed to customers. What's more, MWC performs an essential and integral step in producing this distinct marketable good—it blast freezes the food. Without MWC here, there is no blast-frozen food for MWC's Depositors to sell to their own customers. Because blast freezing provides an essential and integral step in the process of

making blast-frozen food—transforming it into a distinct marketable good—MWC engages in direct production and qualifies for the industrial exemptions under Indiana Code sections 6-2.5-5-3 and 6-2.5-5-5.1.

From our view, this outcome not only applies the plain meaning of "direct production" contained within the pertinent industrial exemption statutes and administrative regulations, but it reflects outcomes from similar cases. For example, we liken this present case to Indianapolis Fruit v. Department of State Revenue where the Tax Court held that applying ethylene gas to unripe bananas constituted production for purposes of the industrial exemption statutes. 691 N.E.2d at 1385.

In that case, Indianapolis Fruit, a fruits and vegetables wholesale supplier, received un-ripened tomatoes and bananas and processed them before distributing them to its customers. Id. at 1381. Specifically, the bananas arrived in an unmarketable condition—green, hard, and inedible. Id. To comply with customer specifications, the wholesaler placed the bananas in a designated area where they were inspected, placed in ripening booths, and exposed to ethylene gas. Id. This ripening step could last from four to eight days. Id. at 1382. The wholesaler would ship the bananas once they ripened to the customer's specifications. Id. But for the gas exposure, the bananas would not ripen and would turn from green to black, not green to yellow. Id. at 1381.

The wholesaler implemented a similar process for the unripe tomatoes, except for one step. The wholesaler did not apply ethylene gas to tomatoes. Id. at 1382. Instead, when the wholesaler received the tomatoes, it inspected them, and placed them in processing units. Id. Once the tomatoes ripened on their own, the wholesaler would either ship them to customers or keep them for further processing. Id.

In evaluating the wholesaler's refund claims for sales tax paid on equipment used in the banana and tomato ripening processes, the Tax Court held that the wholesaler engaged in production when it ripened bananas, but not tomatoes. Id. at 1385-86. Specifically, the Court noted how the wholesaler's process actively induced ripening by exposing the bananas to ethylene gas, and, thereby, transformed the bananas from an unmarketable product to a marketable one. Id. at 1385. When explaining the difference between the wholesaler's banana and tomato ripening processes, the Tax Court aptly observed: "[W]ith respect to the bananas, Indianapolis Fruit *made* something happen; with respect to the tomatoes, Indianapolis Fruit *let* something happen." Id. at 1386. The

Court, therefore, held the wholesaler's banana ripening process constituted production and satisfied the requisite industrial exemption. Id. at 1385. In other words, the Tax Court held that exposing bananas to ethylene gas proved an essential integral step in transforming bananas into a distinct marketable good.

We associate blast freezing food with ripening fruit with ethylene gas. Just as exposing bananas to ethylene gas proves essential and integral to producing ripe bananas, placing food in a separate freezer area and forcing cold air around it to blast freeze it proves essential and integral to producing blast-frozen food. Like Indianapolis Fruit, MWC receives an unfinished product and actively transforms it into a finished product. Put differently, MWC receives an unmarketable product and transforms it into a marketable one.

**III.    The industrial exemptions statutes do not require that taxpayers engage in their own production process to qualify for sales tax exemptions.**

After resolving the merits of MWC's refund claims, the Tax Court stated that "the taxpayer who purchases the electricity or equipment in question must use those purchased items as part of its *own* process to produce other tangible personal property, 'not as part of an alleged process of another taxpayer.'" Merchandise Warehouse Co., 67 N.E.3d at 672 (quoting Ind. Waste Sys. of Ind., Inc. v. Ind. Dep't. of State Revenue, 633 N.E.2d 359, 362-63 (Ind. Tax Ct. 1994)). Reading the plain language of the Equipment Exemption statute and the Consumption Exemption statute, we do not see a requirement that taxpayers be engaged in their *own* production process in order to qualify for those exemptions.

The Equipment Exemption provides, in relevant part, that "transactions involving manufacturing . . . equipment are exempt from [sales tax] if the person acquiring that property acquires it for direct use in the direct production . . . of other tangible personal property." I.C. § 6-2.5-5-3(b). We see no qualification that the purchaser use the equipment in its *own* production process. The plain language simply requires that the equipment be directly used in direct production. Thus, considering both what the statute does and does not say, Day v. State, 57 N.E.3d 809, 812 (Ind. 2016), we conclude the Equipment Exemption does not require a purchaser to use the equipment in its own production process.

10

The Consumption Exemption states that "[t]ransactions involving tangible personal property are exempt from [sales tax] if the person acquiring the property acquires it for direct consumption . . . in the direct production of other tangible personal property in the person's business of manufacturing, processing, [etc.]" I.C. § 6-2.5-5-5.1(b). The Department points to "in the person's business" as the requirement that property be consumed in the taxpayer's own production process. To arrive at that conclusion, however, one must read the statute to require that the person's business be producing certain tangible personal property. But we read the plain language differently. The statute requires only that the purchaser be in the business of manufacturing, processing, etc., not in the business of making a particular good. Therefore, from the statute's plain language, we see no requirement that electricity be consumed in a taxpayer's *own* production process.

The Tax Court supported its conclusion that a taxpayer must consume electricity in its own production process with citations to two cases, namely: Indiana Waste Systems of Indiana, Inc. v. Indiana Department of State Revenue and Indiana Department of Revenue v. Interstate Warehousing. We find those cases distinguishable and not controlling here.

Indiana Waste Systems considered a different iteration of the Equipment Exemption statute. 633 N.E.2d at 362-63 (quoting prior Equipment Exemption that required that "the taxpayer who purchases the equipment in question be the entity that uses the equipment 'for *his* direct use in the direct production, manufacture, [etc.] of other tangible personal property'"). Indiana Waste Systems also cited this Court's opinion in Indiana Department of State Revenue v. Cave Stone, Inc., to support its statement that a taxpayer must have its own production process to qualify for the Equipment Exemption. Id. at 363. But Cave Stone does not support the proposition that a taxpayer has its own production process either. Cave Stone's holding turned upon whether equipment played an essential and integral part in transforming tangible personal property into a marketable product. Cave Stone, 457 N.E.2d at 524. In support of that holding, Cave Stone simply reiterated the statute's requirement that "the transportation equipment in question was directly used by the purchaser, not some other entity." Id. at 525. It did not graft on to the statute any requirement that the taxpayer have its own process. Consequently, Indiana Waste Systems' declaration that a taxpayer have its own process to produce tangible personal property must be limited to the facts of that case and not applied as a rule going forward.

11

Likewise, Interstate Warehousing is not controlling here. In that case, this Court considered, in part, whether a taxpayer was in the business of manufacturing, processing, refining, etc., for purposes of the Consumption Exemption. 783 N.E.2d at 252. The taxpayer there warehoused its customers pre-frozen agricultural goods. Id. at 249. The taxpayer kept its storage rooms cool by circulating chilled ammonia through a closed loop distribution system. Id. The taxpayer sought a refund for sales tax paid on electricity used to convert ammonia from gas to liquid. Id. This Court rejected the refund claim because we held the taxpayer was "not engaged in the 'business of . . . processing.'" Id. at 252. Specifically, we noted that the taxpayer did not "perform an integrated series of operations resulting in a transformed end product to [its] customer." Id. (citation omitted). In other words, the taxpayer's cool air did not substantially change products stored in its warehouse. Because there was no transformation, there was no processing. We did not base our holding on whether the taxpayer engaged in its *own* process.

In sum, neither the industrial exemptions nor our case law establishes a rule that a taxpayer have its *own* production process to qualify for a sales tax exemption. Here, MWC shouldered no burden to prove that its blast freezing process represented a separate, stand-alone process that yielded its own distinct marketable good. MWC needed prove only that it was engaged in the business of "manufacturing, processing, refining, etc." when it blast froze its customers' food products. It did that by showing how blast freezing substantially changed the food into a distinct marketable product.

## Conclusion

Today we reaffirm the longstanding principle that direct production involves a process that includes those steps essential and integral to transforming tangible personal property into a distinct marketable good, i.e., the good actually marketed to consumers. In so doing, we hold that MWC's blast freezing process constitutes direct production because it represents the crucial final step in creating a distinct marketable good—blast frozen food. Furthermore, the relevant statutes and regulations impose no requirement that MWC's blast-freezing procedure be its own, separate production process. Consequently, we grant review and reverse the Tax Court, enter summary judgment for MWC on the direct production issue, and remand for further proceedings consistent with this opinion.

Rush, C.J., and David, Massa, and Slaughter, JJ., concur.

12